ERASTUS F. MEAD AND ANOTHER, TRUSTEES, *vs.* THE NEW
YORK, HOUSATONIC & NORTHERN RAILROAD COMPANY
AND OTHERS.

A general law of the state of New York authorized any railroad companies
having continuous lines to unite and form a single corporation. Two railroad
companies owning roads one of which was wholly within that state and the
other partly within that state and partly within the state of Connecticut,
made an agreement to consolidate and took all the formal measures required
to accomplish it, but a question was made as to the validity of the consolida-
tion by reason of the roads not having at the time a completed continuous
track. A resolution of the legislature of Connecticut had provided that,
whenever the company owning the road lying partly within this state should
be consolidated with any other company in the state of New York in pursu-
ance of the laws of that state, the new company should have all the rights
within this state that were possessed by the old. Held—

1. That an act subsequently passed by the legislature of New York recognizing
   the consolidated corporation as in existence, validated and established the
   agreement under which the consolidation was made.
2. That when the legal existence of the new corporation in the state of New
   York became thus established, it satisfied the requirements of the Connecticut
   act, and the new company became possessed of all the rights in this state which
   had been possessed by the old company.

And held that the new corporation succeeded to the power, possessed by the old
company both in this state and in the state of New York, to issue its bonds to
an amount necessary for completing its road, and to mortgage its property
and franchise for their security.

And that this power included the power to issue its bonds in exchange for, and
to take up, bonds previously issued by the old company and secured by a
mortgage of its property.

A bill in equity alleged that the new corporation duly issued its bonds and dis-
posed of a large number of them to divers persons, who were bonâ fide holders
of the same and entitled to receive the money due thereon and to the benefit
of the mortgage. Held to be a sufficient averment that the bonds were law-
fully issued and used.

After the bonds were issued and the mortgage executed, and while both were
outstanding unsatisfied, but before the mortgage had been recorded, a creditor
of the company, with knowledge of all the facts, attached and afterwards
levied his execution upon the mortgaged property. Held that he stood no
better than if, with such knowledge, he had taken a conveyance of the prop-
erty, and that he did not obtain priority of title.

A court of chancery in this state has jurisdiction of a bill for the foreclosure of
such a mortgage, although embracing property out of this state as well as
within it.

It is a well established principle that a court of chancery, acting primarily *in
personam* and not merely *in rem*, may, where a person against whom relief is

sought is within the jurisdiction, make a decree, upon the ground of a contract or an equity subsisting between the parties, respecting property situated out of the jurisdiction.

BILL for a foreclosure of a mortgage executed by the respondent railroad corporation to the petitioners as trustees for the holders of its bonds; brought to the Superior Court in Fairfield County.

The New York, Housatonic & Northern Railroad Company, the respondent corporation, was a new corporation constituted by the consolidation of two previously existing railroad corporations, one of which bore the same name, and was located in part in this state and in part in the state of New York, and the other was the Southern Westchester Railroad Company, located wholly within the state of New York. John S. King and John E. Sergeant, who had severally, as creditors of the new corporation, attached the portion of the mortgaged property which was in this state, were also made respondents.

The mortgage in terms covered " all the corporate property and franchises of the said party of the first part, and also all and singular its railroad lying partly in the state of New York and partly in the state of Connecticut, constructed and to be constructed, real estate, rails, fences, bridges, depots, shops, tools, machinery, locomotives, engines, tenders, passenger, freight, baggage and hand-cars, and apparatus and utensils of every kind whatsoever, belonging to said party of the first part, or which shall hereafter be acquired by it."

. The following facts were found by the court:—

On the 8th day of September, 1863, a railroad corporation was organized and established in the state of New York, under the general railroad laws of that state, under the name of " The New York, Housatonic & Northern Railroad Company," for the purpose of constructing, maintaining and operating a railroad, from a point in the New York & Harlem Railroad, in the town of White Plains, in the state of New York, to a certain point in the line between the states of New York and Connecticut, and thence to a point in the line of the Housatonic Railroad, near Brookfield Station, in the state of Connecticut, the length of the road to be constructed by

the corporation between White Plains in the state of New York, and Brookfield in the state of Connecticut, being thirty-eight miles, (twenty-four miles in the state of New York, and fourteen miles in the state of Connecticut,) with a capital stock of one million dollars, consisting of ten thousand shares of one hundred dollars each.   Soon afterwards the corporation located and established the line of its road in the state of New York, and, prior to the making of the mortgage set forth in the petition, procured the right of way for the construction thereof, and graded from one-half to two-thirds of it, and laid down a temporary track on a part of the road-bed, over which were run an engine and cars used by the contractors for the purposes of construction.

Under an act of the General Assembly of this state, passed at its May session, 1864, and an act passed by the legislature of the state of New York on the first day of May, 1865, authorizing the New York, Housatonic & Northern Railroad Company "to accept a grant for railroad purposes made by the state of Connecticut," the corporation, soon after the passage of the last act, duly located its railroad upon the line and within the limits prescribed by the acts, from the boundary line between the states of Connecticut and New York at Greenwich to the Housatonic Railroad in Brookfield; and obtained title in fee simple to the lands in Brookfield and Danbury, necessary for the railroad and for depots thereon, along the line from the Housatonic Railroad to the village of Danbury, and obtained the right of way for the construction of the residue of the line of road within this state; and constructed, completed, equipped and put into full operation that part of the road between the Housatonic Railroad and the village of Danbury before the making of the mortgage, and the road then was and has ever since been in full operation between the two points last mentioned.

Afterwards, under an act of the General Assembly of this state, entitled "An act enabling the New York, Housatonic & Northern Railroad Company to embrace all its property in New York and Connecticut in one mortgage," passed at its May session, 1867, the corporation on the second day of Sep-

tember, 1867, in the state of New York, made and executed, in conformity with the laws of that state, a mortgage of that date, whereby it mortgaged all its property and franchises in both states to trustees as security for its bonds to be issued to the amount of one million of dollars, (only one of which bonds was ever issued,) which mortgage was afterwards, in the month of September, 1868, duly satisfied and discharged of record; and on the 1st day of August, 1868, the corporation in like manner made and executed a certain other mortgage of that date, in the state of New York, mortgaging all its property and franchises to the petitioners as trustees, as security for its bonds to be issued to the amount of two millions five hundred thousand dollars, a large amount of which bonds were sold; which mortgage was also, (about the 4th day of December, 1872, in the state of New York, and about the 6th of said December in the state of Connecticut,) duly satisfied and discharged of record. The corporation held its annual stockholders' meetings, appointed directors, kept a record of the doings of its stockholders and directors, and performed many other corporate acts until about the 10th day of September, 1872.

Prior to the 18th day of April, 1872, another railroad corporation had been duly organized and established in the state of New York, under the name of the Southern Westchester Railroad Company, for the purpose of constructing, maintaining and operating a railroad from a point in the line of the New York, Housatonic & Northern Railroad Company, a little east of White Plains, in a southeasterly direction about sixteen miles to Long Island Sound, at or near Harlem River, with a capital stock of two millions of dollars, in shares of one hundred dollars each; and on the day last aforesaid had a president, board of directors and other officers, and was then in active operation and full life, and then owned franchises and property of large value; but no part of its railroad had been completed or in operation, and it was not then operating in fact any railroad within, or partly within and partly without, the state of New York. The railroads of the two corporations were capable of forming, and would form

when completed, a continuous line of railroad with each other from the Housatonic Railroad, through the point of their union with each other before mentioned, to the Harlem River.

On the 18th day of April, 1872, the two corporations undertook, under the laws of the state of New York then in force respecting the consolidation of railroad companies, to merge and consolidate their several capital stocks, franchises and property into one company, and the directors, officers and stockholders of the two corporations respectively made and adopted an agreement of consolidation, and did respectively all those things which are required by those laws to be done in order to perfect such consolidation between two railroad companies having the right to consolidate with each other under those laws; so that, if, upon the facts herein set forth, the two corporations then had a legal right to consolidate with each other under those laws, they became by said proceedings duly consolidated. The agreement of consolidation was executed under the corporate seal of each of the companies on the 18th day of April, 1872, and was adopted by the stockholders of each of the companies in due form separately on the 10th day of September, 1872; was executed by the presidents of the companies respectively, by the authority and direction of the boards of directors of the companies respectively; and a certificate thereof was filed in the office of the secretary of the state of New York on the 3d day of October, 1872. The name of the consolidated corporation under the agreement was "The New York, Housatonic & Northern Railroad Company."

On the 8th day of October, 1872, a meeting of the stockholders of the consolidated company was duly holden, at which a board of directors was chosen, to wit, George W. Mead, David S. Duncomb, L. D. White, E. F. Mead, T. Clark, Jr., H. Hall, E. E. Bouton, C. D. Bailey, W. Keeler, J. Benedict, S. D. Mead, L. D. Rucker, and William Raynor, who accepted their trusts and then became and acted as directors of the new company for the year next to ensue; and the board of directors held a meeting afterwards on the same day and appointed L. D. Rucker president of the new company,

and heard read the mortgage which is set forth in the petition; and thereupon, by a unanimous vote, authorized Rucker, as president, to execute and deliver the mortgage and the bonds thereby to be secured, for and in behalf of the new corporation; such mortgage to be made to the present petitioners, Erastus F. Mead and David S. Duncomb, as trustees for the holders of the bonds to be issued under the mortgage. Afterwards on the 18th day of October, 1872, Rucker, as president, did execute to the petitioners the mortgage in due form in the name and behalf of the new corporation, and the same was made and perfected in conformity with the laws of the state of New York relating to the making of such mortgages, and was delivered by Rucker to the petitioners, who caused the same to be duly recorded in the county of Westchester in the office of the clerk and register of the county on the 4th day of December, 1872, and in the office of the secretary of the state of Connecticut on the 9th day of December, 1872, and in the land records of the towns of Danbury and Brookfield respectively on the 19th and 24th days respectively of September, 1874.

All the bonds provided for in the mortgage were afterwards duly executed and issued, and delivered in different amounts to different persons for valuable considerations received by the corporation therefor—a portion of the bonds, amounting to about $600,000, being issued and used in exchange for, and for the taking up of, the same amount of bonds then outstanding which had been issued under and secured by the second mortgage of August, 1868, made by the original New York, Housatonic & Northern Railroad Company.

The consolidated company has ever since regularly held annual stockholders' meetings and appointed its boards of directors, and has expended a small amount of money and done a small amount of work on the lines of both the first mentioned roads.

John S. King, one of the respondents, on the 2d day of September, 1874, brought an action at law against the consolidated company by a writ of attachment which was levied upon the real estate and other property of the company in

Danbury and Brookfield mentioned in the mortgage, and afterwards recovered judgment against the company for the sum of $132,796.14, debt and costs, and on the 22d day of April, 1875, caused an execution to be issued on the judgment, which, afterwards, on the 3d and 4th days of May, 1875, was levied upon the lands of the corporation in the manner prescribed by law for the levy of execution upon lands not encumbered by mortgage, and not in the manner prescribed by law for the levy of execution upon an equity of redemption in lands—said lands being all of the lands of the corporation situated in the towns of Danbury and Brookfield respectively, and being lands covered by and embraced within the mortgage made by the new corporation; by which levy the officer set out to King, (if such levy was in legal form,) all said lands in satisfaction of part of the judgment; which execution was afterwards duly returned and recorded. The levy took no notice of the mortgage, and was made in disregard thereof. King has ever since claimed that the levy was valid, and vested in him a good title to the lands in fee simple.

At the time of the execution and delivery of the mortgage in question, and at the time of the execution and issue of the bonds thereby secured, King had full and actual knowledge of such execution, delivery and issue, and knew at the time of the commencement of his suit that the same were still outstanding and unsatisfied. The suit was brought by King as assignee of certain judgments in some of which Rucker then had an interest, and as the agent of Rucker to the extent of his interest; and Rucker, at the time of the commencement of the suit, had the same full and actual knowledge which King had, in relation to the mortgage and bonds.

The facts found with regard to the claim of the respondent Sergeant are omitted, as no question arose thereon in this court.

Prior to and at the time of the service of the petition in the present case all the bonds secured by the mortgage were, and still are, outstanding in the hands of sundry persons, namely, one thousand seven hundred and fifty bonds for one thousand dollars each, and five hundred bonds for five hund-

red dollars each; each of said bonds having attached to it the set of coupons or interest warrants properly belonging to it in conformity with the plan and provisions of the mortgage, and each of the coupons being, on its face and in its terms, made payable to the bearer thereof. One of the coupons on one of the bonds has been paid, and no more.

At the time of the service of the petition there was due from the corporation, as interest upon each of the bonds of one thousand dollars, five coupons of $35 each, dated October 1st, 1873, April 1st, 1874, October 1st, 1874, April 1st, 1875, and October 1st, 1875, respectively; and there were then, in like manner, due from the corporation, as interest upon each of said bonds for five hundred dollars, five coupons of $17.50 each, bearing the same dates last above mentioned respectively, each of which coupons was then due to the lawful holder thereof (except only the single coupon found to have been paid); all of which coupons, so then due, are still unpaid, and are due and payable to the lawful holders of them respectively, and the total amount due from the corporation, as interest upon all the bonds to all the holders of the coupons, and then unpaid, was $349,965.

The value of the property in this state covered by the mortgage is one hundred thousand dollars.

Upon these facts the court (*Beardsley, J.,*) passed a decree foreclosing the mortgage unless the amount due upon the coupons was paid to the several holders with interest, (the decree providing for a deposit in a bank named of the amount of any coupons not presented for payment within the time limited for redemption,) and declaring the levy of the execution of the respondent King to be of no effect, and conferring no title to the property, and that the respondent Sergeant had no title to the mortgaged property or any part thereof.

The respondent King and the New York, Housatonic & Northern Railroad Company filed a motion in error and brought the record before this court, assigning the following errors:

1st. That the mortgagors at the time of the making of the mortgage had no legal or valid existence.

2d.   That the agreement for consolidation was inoperative and void because neither of the corporations was then "operating a railroad either wholly within or partly within and partly without the state of New York."

3d.   That the consolidation, if valid in the state of New York by the laws thereof, did not and could not transfer to the new company the rights, franchises and property of the old company in this state and the new company at the time of the mortgage had no interest therein.

4th.   That the Superior Court had no jurisdiction of the subject matter and no right or authority to pass any decree in the premises, inasmuch as the property was included in a New York mortgage and subject to the laws and courts of that state.

5th.   That a part only of the property described and included in the mortgage was charged with the payment of the entire amount found due.

6th.   That the respondents were required to determine who are the "lawful" owners and holders of the unpaid coupons.

7th.   That the respondents were required to deposit in bank the amount of all the unpaid coupons not presented, and which were outstanding and unpaid.

8th.  That the franchises granted by this state were included in the mortgage and in the decree.

9th.   That it was neither averred, nor proved true, that the bonds were used for the purposes for which they purport to have been issued.

10th.   That the mortgage was not recorded in this state until after the levy of the attachment of King.

*J. N. Whiting*, of New York, and *A. S. Treat*, with whom was *R. Averill*, for the plaintiffs in error.

1.   The original New York, Housatonic & Northern Railroad Company was organized on the 8th day of September, 1863, under the general laws of the state of New York, with a capital stock of $1,000,000, for the purpose of constructing a railroad from White Plains to the Housatonic Road in

Brookfield, partly in New York and partly in Connecticut. Being a New York corporation, of course they had no right to build any road in this state. Instead of forming another company in this state, the company applied to the legislature and obtained by resolution the powers usually conferred by charter upon railroad companies in this state. There was one company in name, but acting in and by authority from different states, and subject to different laws; practically two companies, one holding and managing the road and property in and according to the laws of New York, the other holding and managing the road and property in and according to the laws of Connecticut. By the general law of New York the company had power to borrow money "for completing and finishing or operating their road, to issue and dispose of bonds therefor, and to mortgage their franchises and property to secure the same." 2 N. Y. Rev. Stat., p. 533. In Connecticut railroad companies may borrow money and issue bonds equal in amount to one-third the amount actually expended, and may secure them by a mortgage of their property to the treasurer of the state. Gen. Stat., p. 332, 333. The court will observe the marked difference in the provisions of these different states upon the same subject. In 1867, being desirous of borrowing money, the company obtained authority from our legislature to include in a mortgage of their New York franchises and property, their franchises and property in this state. Two mortgages were subsequently made, but as they were satisfied of record before the parties interested acquired any interest in the mortgaged property it is unnecessary to notice them farther. In the order of time we now come to the mortgage in question, made October 1st, 1872. Of course proper parties capable of contracting are indispensable to a valid deed. This deed purports to have been made by "The New York, Housatonic & Northern Railroad Company."

2. We say this company had no legal or valid existence. It claimed to have been formed by a consolidation of the old company of the same name with the Southern Westchester Railroad Company. The right of these companies to consol-

idate must of course be sought in the law of New York, where both companies were located. By that law, (2 N. Y. Rev. Stat., 556,) any railroad company "operating a railroad either wholly within or partly within and partly without the state," might merge and consolidate with any other company, both having been duly organized. The court finds that the Southern Westchester Company was not in fact at the time so operating a railroad. The court also finds that the old company had located the line of its road in New York, had graded only from half to two-thirds thereof, and had laid a "temporary track on some parts thereof," over which the contractors, not the company, ran "an engine and cars for the purposes of construction." This the gentlemen call "operating" a railroad. The act of 1864, of this state, also requires the road to be "put in operation." "Operating" a railroad within the meaning of these statutes is its constant use in the running of trains in its regular course of business, for passengers and freight, over its entire length. *People* v. *Albany & Vermont Railroad Co.*, 24 N. York, 261; *State* v. *Hartford & New Haven Railroad Co.*, 29 Conn., 538. So then the company was not at the time of the attempted consolidation "operating" a railroad anywhere. Companies cannot consolidate without the sanction and authority of the legislature, and must bring themselves clearly within the provisions upon which the authority is granted. Green's Brice's Ultra Vires, 278. A charter being a contract any alteration must have the sanction of the legislature. Id., 539. The legislature itself cannot make an alteration without previous public notice. Gen. Stat., 79. A corporation cannot even dissolve itself. *Reed* v. *Cornwall*, 27 Conn., 48. And as a corporation can neither create nor destroy itself, so it can neither form nor dissolve another, either alone or with others. *Medical Institution* v. *Patterson*, 1 Denio, 61. But it is said that the consolidation has been ratified, and we are referred to several acts passed by the legislature of New York. Doubtless an attempted consolidation without authority may be ratified and validated by the same sovereign power that could have granted the necessary authority before consolidation.

But an enactment of this sovereign power is necessary in both cases, and just as necessary in one as in the other. And the act must be express; it must have all the usual formalities and be passed with intent to ratify. *Bishop* v. *Brainard*, 28 Conn., 289. These acts of the legislature were nothing more than a recognition. Now a recognition is one thing, a ratification quite another. In the organization of companies some things are essential, some non-essential; some matters of form, some of substance; some indispensable, some not. Recognition applies only to defects in form. *Black River &c. R. R. Co.* v. *Barnard*, 31 Barb., 258.

3. If consolidation was valid or made valid in the state of New York, still that did not in anywise affect the title to the mortgaged property in this state. The original corporation still remained in existence in this state, even though the consolidation was valid under the laws of New York. *Muller* v. *Dows*, 4 Otto, 444, 447. If the title did pass from the old company to the new, then how and by what authority? All we have to do is to look at the grant of power by this state in 1864, and accepted by the company in 1865. No such authority is conferred. The conferring of powers and privileges imposes corresponding obligations. An accepted charter being in the nature of a contract, one of the parties cannot release itself and substitute a new party. The consent of the other is indispensable. "It is a rule of construction that all grants from the state and grants of franchises must be construed strictly and most strongly in favor of the public and against the grantee." Green's Brice's Ultra Vires, 63, and cases there cited. "The existence, franchises, powers, capacities, duties and liabilities of every corporation are created, fixed, limited and qualified, both in action and time, by the law of the state granting the charters. *Penobscot Boom Corporation* v. *Lawson*, 16 Maine, 224; *Michigan Bank* v. *Gardner*, 15 Gray, 362. In Connecticut "a corporation has only such rights and powers as are expressly granted, or as are necessary to carry into effect the rights and powers so granted." *Occum Co.* v. *Sprague Manuf. Co.*, 34 Conn., 541. In New York "the powers granted will extend no further than

expressly stated, or than is necessary to accomplish the general scope and purpose of the grant." *N. York & Hartford R. R. Co.* v. *Kip*, 46 N. York, 552. In addition to the powers enumerated or expressly given "no corporation shall possess or exercise any corporate powers except such as shall be necessary to the exercise of the powers so enumerated and given." 2 N. Y. Rev. Stat., 391.

4. The courts of this state have no jurisdiction. The mortgage and the petition both count on the act of 1867. It is a little difficult to see how an act of 1867, authorizing the old company then existing to do certain things, can authorize the new company, organized five years afterwards, to do the same thing. The act is a peculiar one. It first provides that the company, in any mortgage of its property in the state of New York, may include its property in this state; then declares that "such mortgage shall be deemed and held good and valid, and then defines its "operation and effect." Everybody in this state knows what a good and valid mortgage is, its operation and effect, what rights and remedies it gives, and if it was to have merely the ordinary "operation and effect" then the last clause of the act is superfluous and without significance. It says such mortgage shall have the same "operation and effect upon said property rights and franchises of said corporation in this state as if said property rights and franchises were held and owned in the state of New York, and were so mortgaged in that state pursuant to the laws thereof." That is, that the entire property should be subject to the laws and courts of only one state. This state transferred its jurisdiction over it to the state of New York so far as this mortgage is concerned. In New York mortgaged premises are sold, in this state a time is limited for redemption. The inconvenience, not to say injustice, of different proceedings in different states is quite obvious, and is a good reason why the company procured the act to be passed. It was to prevent just the result of which we complain, that part of the property is charged with the whole amount found due, that the act was sought for and obtained.

5. The respondents are required to determine who are

"lawful" owners of the bonds. The decree requires them to pay every "lawful owner and holder," or lose their property. The use of the word "lawful" is both suggestive and significant. The court evidently deemed it quite possible, if not more than probable, that some of the parties having bonds and coupons were not "lawful owners and holders." The petitioners, at the time of the mortgage, were also directors. Suppose they had each taken a large amount of the bonds at fifteen per cent. of their par value in payment of debts they had or claimed to have against the old company, and now hold them, would they be "lawful owners and holders"? The statute prescribes for what money may be borrowed, bonds issued and mortgages given. The mortgage also specifies the object to be "for constructing, operating and maintaining its railroad," and the act of 1867 declares the mortgage "good and valid" "for the purpose therein specified," and also prescribes what debts and liabilities of the old companies shall attach to the new, and expressly excepts mortgages. Yet $600,000 of new bonds were issued and used to take up the same amount of old bonds, secured by mortgage of the old company in August, 1868. Clearly the first owners and holders of these bonds cannot be "lawful" owners and holders. The court should have found who were the lawful owners, or at least have laid down some rule by which the company could decide. Suppose the company knew, or upon investigation should find, that some of the coupons are not lawfully held and owned, and upon presentation payment is refused or they are not presented, then the respondents must deposit the amount of all unpaid coupons in bank, where it can be obtained without enquiry. If a large amount of bonds or coupons have been lost, destroyed by fire or otherwise, the bank under this decree will reap the benefit.

6. The franchises granted by the state are included in the mortgage and decree. If the mortgage was under the act of 1867, then they were properly included. But the act of 1867 could apply only to the company then in existence, which could not transfer its power to the new company. But it has been and may be claimed that railroad companies have the

same right to mortgage their property as individuals. Without discussing the question whether the provisions of our statute prescribing the mode and purposes in and for which money may be borrowed and bonds issued by railroad companies does not limit them to the mode and purposes prescribed, we simply say that franchises cannot be mortgaged without express legislative authority. Green's Brice's Ultra Vires, 124, and cases cited in note.

7. It is neither averred nor proved that the bonds were used for a lawful purpose. The averments of the petition are that the mortgage was made to the petitioners "as trustees, for the benefit of all persons who should thereafter become holders in good faith of such bonds," that is, bonds issued by the company for money borrowed "for the purpose of constructing, maintaining and operating its railroad." Also that the company "did make, issue, sell, deliver and dispose of, to divers persons, a large number of bonds," whereby "many persons became and were and still are the bonâ fide holders and owners thereof." The petition should also have stated, as it does not, what the bonds were sold for, and how these persons became and are bonâ fide holders thereof, and then the court could have determined whether they were or not. Bonds can be issued only for money borrowed. If the bonds or coupons were negotiable then an innocent third party might be a lawful holder. But no such question arises in this case, as the court has not found either that the bonds were negotiable or that they or the coupons are held by innocent parties. The court has found that all the bonds were issued and delivered to different persons "for valuable consideration." But has not found that they were so issued for the statute consideration, "money borrowed," or for any full, fair and adequate consideration.

8. The mortgage was not recorded in this state until after King's attachment. It is true that the court has found he had knowledge of the mortgage, but it has also found that his attachment was made September 2d, 1874, while the deed was not recorded in Danbury and Brookfield until September 19th and 24th, 1874. Very nearly two years had elapsed and

no excuse is offered for the delay. The question then is, whether an attaching creditor with notice shall be postponed to a grantee of a prior mortgage not recorded within a reasonable time. Manifestly there is a difference between an attachment and a purchase. One creditor is as much entitled to payment as another, and may as lawfully secure his debt by attachment as the other by mortgage. If anybody is chargeable with fraudulent conduct it is the trustees who kept their deed from record two years. The reason a subsequent purchaser with notice is postponed, is that "his purchase in such a case is a fraud." Why? "Because he is assisting the prior vendor to defraud the prior vendee." *Le Neve* v. *Le Neve*, 3 Atk., 646; *Jackson* v. *Bengoll*, 10 Johns., 457. "The rule is founded on the presumed fraud of the party." *Wheaton* v. *Dyer*, 15 Conn., 311. The fraud consists in depriving the first grantee of something, or as Lord Hardwicke said, it "takes away the right of another person." *Le Neve* v. *Le Neve*, 3 Atk., 654. By our statute (Gen. Statutes, p. 353,) the grantee of a valid deed unrecorded holds only against the grantee and his heirs; he has good title against them, but has none against an attaching creditor. Its record is as indispensable to a complete title as the deed itself. *Welch* v. *Gould*, 2 Root, 287. An attaching creditor takes no interest that the prior grantee has; he is guilty of no fraud himself, and participates in no fraud of another. The reason of the rule applied to purchasers does not exist in the case of an attaching creditor, and therefore the rule does not apply to him. The true rule then is, that a conveyance to be effectual to hold lands against an attaching creditor must be actually recorded in a reasonable time. And this rule is supported by the decisions in this state. *Hartmyer* v. *Gates*, 1 Root, 61; *Moor* v. *Watson*, id., 388; *Welch* v. *Gould*, 2 id., 287; *Hinman* v. *Hinman*, 4 Conn., 575; *Carter* v. *Champion*, 8 id., 549; *Peck* v. *Whiting*, 21 id., 206; *Pond* v. *Skidmore*, 40 id., 213. But suppose we are wrong as to the law of Connecticut, then we call the attention of the court to the law of New York. As this is a New York mortgage, which "includes" property in this state, and has the "same operation and effect"

upon it as if it were held and owned in that state, it would seem that this question should be decided by the law of New York. The rule there with regard to purchasers with notice is the same as here. In a very recent case between the trustees of an unrecorded railroad mortgage and an execution creditor with notice, the Court of Appeals decided in favor of the creditor. *Hoyle* v. *Plattsburgh & Montreal R. R. Co.*, 54 N. York, 314. If then the law of Connecticut be as we claim, or the law of New York governs, evidently King's execution was properly levied, and he will hold against the petitioners.

*H. B. Harrison* and *W. K. Seeley*, for the defendants in error.

HOVEY, J. The motion in error upon which the record in this cause is brought before us for revision, was filed by the respondent King as a stockholder and an attaching and execution creditor of the other respondent, the New York, Housatonic and Northern Railroad Company; and he is the only party who actually appears here as plaintiff in error and claims to be aggrieved by the decree of the Superior Court, though the respondent company is nominally a party.

Several questions are raised by the assignment of errors, some of which, owing to their importance, deserve careful consideration.

The first question is whether the respondent, the New York, Housatonic and Northern Railroad Company, at the time it executed, delivered and issued the mortgage and bonds described in the bill of the plaintiffs below, had a corporate existence under the laws of this state or of the state of New York. The record shows that on the 8th day of September, 1863, a corporation was duly organized under the laws of the state of New York, by the name of the New York, Housatonic and Northern Railroad Company, for the purpose of constructing, maintaining and operating a railroad from a point in the New York and Harlem railroad in the town and village of White Plains in that state, to certain points in the

boundary line between that state and this, and thence to a point in the Housatonic railroad near Brookfield station in Fairfield County, and also for the purpose of operating a railroad between the latter point and the points referred to at the state line and in White Plains and the city of New York; that the corporation so organized soon afterwards located and established the line of its road in the state of New York, procured the right of way for the construction thereof, graded from one-half to two-thirds of the same, and laid down a temporary track on some parts of the road, over which were run an engine and cars, by the contractors, for the purposes of construction.

On the first day of July, 1864, that corporation obtained from the General Assembly of this state authority to continue and extend its road from the point where it touched the state line, to the Housatonic railroad in the town of Brookfield; to purchase, receive and hold, in fee simple or otherwise, such real estate as might be necessary or convenient for the objects and intentions of the act by which such authority was conferred; to construct, complete, equip, maintain, use and enjoy, a single, double or triple railway upon the route which should be duly laid out or located; and to take, transport and convey persons and property upon the said railway; and also the further authority to make any lawful contract with any other railroad company with whose road its track might connect, in relation to the business or property of the same, and to take lease of any railroad, or lease its railroad to, or make joint stock with, any connecting railroad running in the same general direction as the route of its road; together with all the powers and privileges which then were, or which thereafter should be, conferred on all railroad companies incorporated under the authority of this state, but subject to all the duties, liabilities and regulations imposed upon such railroad companies.

On the first day of May, 1865, this corporation was authorized by the legislature of New York to accept and exercise the powers conferred by the General Assembly of this state, and subsequently did accept the same and located its railroad

from the state line to the Housatonic railroad in Brookfield, and obtained title, in fee simple, to lands in Brookfield and Danbury necessary for its road and for depots along its line from the Housatonic railroad to Danbury. It also obtained the right of way for the construction of the residue of its road within this state, and constructed, completed, equipped and put into full operation that part of its road between the Housatonic railroad and the village of Danbury; and that portion of the road has ever since been in full operation.

On the 20th day of May, 1869, an act was passed by the legislature of New York, making it lawful for any railroad company organized under the laws of that state or of that and any other state, and operating a railroad or bridge either wholly within or partly within and partly without that state, to merge and consolidate its capital stock, franchises and property with the capital stock, franchises and property of any other railroad company or companies organized under the laws of New York, or under the laws of that and any other state, or under the laws of any other state or states, whenever the two or more roads of the companies so to be consolidated should or might form a continuous line of railroad with each other or by means of any intervening railroad, bridge or ferry. The act prescribed the mode by which the consolidation might be made and perfected, and provided that when the agreement and act of consolidation were so made and perfected, and when the same or a copy thereof was filed in the office of the secretary of the state, the corporations parties thereto should be deemed and taken to be one corporation by the name provided in said agreement and act, but that such act of consolidation should not release such new corporation from any of the restrictions, disabilities or duties of the several corporations so consolidated. And it was further provided that upon the consummation of the act of consolidation, all and singular the rights, privileges, exemptions and franchises of each of the corporations parties to the same, and all the property, real, personal and mixed, and all debts due, on whatever account, to either of said corporations, should be deemed to

be transferred to, and vested in, such new corporation without further act or deed.

On the 18th day of April, 1872, an agreement was made between the said New York, Housatonic & Northern Railroad Company and the Southern Westchester Railroad Company, a corporation duly organized under the laws of New York, for the consolidation of the capital stocks, franchises and property of the two corporations. The agreement was in the form prescribed by the New York statute and was duly executed, and on the 10th day of September, 1872, was adopted by the stockholders of each of the corporations; and the same was filed in the office of the secretary of the state of New York on the 3d day of October, 1872. Nothing more was required by the laws of New York to perfect the agreement and consummate the act of consolidation, if, by those laws, the corporations, parties to the agreement, had the right to consolidate their capital stocks, property and franchises, and thus become one corporation. The plaintiffs in error claim that no such right existed, because, although the railroads of the two corporations were capable of forming, and would form when completed, a continuous line of railroad from the Housatonic railroad to the Harlem river, neither of the corporations, at the time the agreement of consolidation was made, was operating a railroad or bridge wholly within or partly within and partly without the state of New York. This claim is an extraordinary one for the party to urge who appears here in no other character, and who has no other interest in the event of this suit, than as a stockholder and creditor of the consolidated corporation. But it is conclusively answered and disposed of by an act of the legislature of New York passed in 1873, which expressly recognized the existence of the consolidated corporation, and thereby ratified and confirmed the agreement by which the consolidation was effected. N. York Stat. of 1873, page 293. It is said, however, by counsel for the plaintiffs in error, that that act was a recognition merely of the corporation, and did not operate as a ratification of the agreement of consolidation. And the case of *Black River Railroad Co.* v. *Barnard*, 31 Barb., 258,

is cited in support of this position. But the court in that case held that, when the organization of a railroad company is regular on its face, and the company, while in the exercise of its corporate franchises, is recognized as such by the legislature, it becomes, by that recognition, a legal corporation. In the case of *The People* v. *Farnham*, 35 Ill., 562, it was held that, where a municipal corporation has been recognized by enactments of the General Assembly, all inquiry into the regularity of its organization will be precluded. And in the case of *Kanawha Co.* v. *Kanawha &c. Coal Co.*, 7 Blatch., 391, it was held that defects in the incorporation of a company under a general mining and manufacturing companies law, were cured by the passage of a subsequent special act recognizing the company by name and extending and continuing its corporate rights and privileges.

So far then as the state of New York is concerned, there can be no doubt that the agreement of consolidation was in all respects valid; and the effect of it was to transfer to and vest in the consolidated corporation all the rights, privileges, franchises and property of the two original corporations in that state. And if such consolidation was authorized by the laws of Connecticut, the effect of it was to vest in the consolidated company all the rights, privileges, franchises and property of the original New York, Housatonic & Northern Railroad Company in this state. The General Assembly of this state, by an act passed on the 31st day of July, 1872, expressly authorized such consolidation, and declared its effect in the following language:

"*Resolved by this Assembly:* Sec. 1. In case the New York, Housatonic & Northern Railroad Company shall avail itself of the powers conferred upon certain railroad companies by the laws of the state of New York, authorizing the consolidation of such railroad companies, and shall, in pursuance of such laws, consolidate with any other railroad company, the new corporation formed by such consolidation, shall have and possess, in this state, all the rights, powers, privileges, exemptions, franchises and property now possessed by said New York, Housatonic & Northern Railroad Com-

pany in this state, or which have heretofore been conferred upon it by the General Assembly of this state, and shall be subject to all duties and liabilities, in the same manner and to the same extent as if such consolidation had not taken place." By the second section of the act the rights of all creditors of the said New York, Housatonic & Northern Railroad Company, and all liens upon its property, were preserved unimpaired, and authority was given to enforce them against the new corporation.

The requirement of the foregoing act that the consolidation shall be in pursuance of the laws of the state of New York, is fully satisfied by any proceeding in that state by which the consolidation is legally effected, whether by a lawful agreement for such consolidation, or an act of the legislature effecting it, or a recognition by the legislature of the consolidated corporation as in existence.

The legal existence of the consolidated corporation in this state as well as the state of New York, is thus conclusively established. There is, therefore, no occasion for the application in this case of that principle of law which estops a party who has contracted with another as a corporation from denying the legal existence of the latter as a corporation.

The effect of the consolidation has already been stated. As declared by the New York law, it was to transfer to, and vest in, the consolidated corporation, without further act or deed, all and singular the rights, privileges, exemptions and franchises of each of the corporations parties to the same, and all their property, real, personal and mixed, and all debts due on whatever account to either of those corporations. As declared by the Connecticut law, the effect of the consolidation was to confer upon and give to the new corporation in this state all the rights, powers, privileges, exemptions, franchises and property possessed, on the 31st day of July, 1872, by the New York, Housatonic & Northern Railroad Company, one of the parties to the agreement of consolidation, in this state, or which had theretofore been conferred upon that corporation by the General Assembly of this state. This disposes of the claim of the plaintiffs in error

that the consolidation, if valid in New York by the laws thereof, did not and could not transfer to the new company the rights, franchises and property of the old company in this state, and shows that the claim rests upon no legal foundation whatever.

The next question is, whether the mortgage which is the subject of this litigation is a valid security for the payment of the bonds which it was executed to secure. This depends, of course, upon the laws of New York and of this state under which the instrument was professedly executed. By the laws of New York each of the corporations which formed the consolidated company was empowered, from time to time, to borrow such sums of money as might be necessary for completing and finishing or operating its railroad, and to issue and dispose of its bonds for any amount so borrowed, and to mortgage its corporate property and franchises to secure the payment of any debt contracted by the company for the purposes aforesaid. And by an act of the General Assembly of this state passed July 12th, 1867, it was provided that in any mortgage of its property and franchises in the state of New York which the New York, Housatonic & Northern Railroad Company might make in conformity with the laws of that state, the said corporation might embrace and include any property, rights and franchises which it might possess in this state, and that any such mortgage should be deemed and held a good and valid mortgage, for the purposes therein expressed, of said property, rights and franchises of said corporation in this state, and should have the same operation and effect upon said property, rights and franchises of said corporation in this state as if said property, rights and franchises in this state were held and owned by said corporation in the state of New York and were so mortgaged in that state pursuant to the laws thereof by said corporation.

That these laws gave to the original New York, Housatonic & Northern Railroad Company full power and authority to mortgage its property and franchises in this state as well as in the state of New York, to secure the payment of such sum or sums of money borrowed as might be necessary for com-

pleting and finishing or operating its railroad, counsel for the plaintiffs in error admit. But they deny that the consolidated company had any such power. It has, however, been shown that the effect of the consolidation was to confer upon, and give to, the consolidated company in this state, all the rights, powers, privileges, exemptions, franchises and property possessed by the original New York, Housatonic & Northern Railroad Company in this state on the 31st day of July, 1872; and this, of course, included the power of borrowing money and mortgaging the property and franchises of the corporation in this state to secure its payment. The mortgage was, therefore, a valid security for the purposes for which it was executed, and operated as a lien upon the franchises as well as upon the real and personal property which became vested in the consolidated corporation by the agreement and act of consolidation.

But it is said by the plaintiffs in error that it is not averred in the bill of the plaintiffs below, and was not proved at the hearing, that the bonds mentioned in the condition of the mortgage were used for a lawful purpose. The bill however alleges that the respondent corporation, the mortgagors, did duly make, issue, sell, dispose of and deliver to divers persons a large number of said bonds, and that by such sale and delivery many persons who received the said bonds became, were and still are the *bonâ fide* holders and owners thereof and entitled to receive the moneys by said bonds agreed to be paid respectively, according to the tenor of said bonds, and entitled also to the benefit of said mortgage. And it is found by the court that all of the bonds provided for in the mortgage were duly executed, issued and delivered in different amounts to different persons for valuable considerations received by said corporation therefor—a portion of said bonds, amounting to about $600,000, being issued and used in exchange for, and for the taking up of, the same amount of bonds then outstanding, which had been issued under and secured by a mortgage of the original New York, Housatonic & Northern Railroad Company. And it is further found by the court that all the allegations of the said bill, except so

far as any of them are inconsistent with the facts found to be true, are true. These allegations and findings, considered in connection with the recitals in the mortgage deed, are sufficient to establish the claim of the defendants in error that the bonds were lawfully issued and used, and that the parties to whom they were issued and delivered, and in whose hands they were at the time of the commencement of the suit in the court below, were *bonâ fide* holders of them for value, and as such are entitled to the benefit of the security which the mortgage was designed to afford.

It is further claimed by the plaintiffs in error that the Superior Court had no jurisdiction of the subject matter of the bill upon which the decree complained of was passed, because by the act of the General Assembly of 1867 this state transferred its jurisdiction to the courts of the state of New York. But this claim cannot be sustained. The courts of New York might, perhaps, have taken jurisdiction of a bill brought by the petitioners for the foreclosure of the mortgaged premises and passed a decree which would have been operative upon that portion of the premises which is situated in this state as well as that portion which is situated in the state of New York. In *Toller* v. *Carteret*, 2 Vern., 495, where a bill was filed by the mortgagee for the foreclosure of the Island of Sark, the defendant pleaded to the jurisdiction of the court, that the Island of Sark was part of the Duchy of Normandy and had laws of its own, and was not under the jurisdiction of the English Court of Chancery. But the Lord Keeper overruled the plea, observing that the Court of Chancery had jurisdiction, "the defendant being served with process here." And it is a principle firmly established that equity, as it acts primarily *in personam* and not merely *in rem*, may, where a person against whom relief is sought is within the jurisdiction, make a decree, upon the ground of a contract or an equity subsisting between the parties, respecting property situated out of the jurisdiction. *Penn* v. *Lord Baltimore*, 1 Ves., 444. But the circumstance that the courts of New York may have jurisdiction does not necessarily oust or deprive the courts of this state of jurisdiction over the

same subject matter, and especially where the latter courts are applied to for relief before the jurisdiction of the courts of New York has attached. The courts of this state have jurisdiction of all cases affecting property located in this state, and of all suits for the foreclosure of mortgages of such property, unless the jurisdiction has been surrendered to other tribunals by the General Assembly. There is no act to be found among our statutes, (except, perhaps, acts ceding certain lands to the United States for federal purposes,) which can be construed as having such an effect. And it is very doubtful whether the General Assembly possess the constitutional authority to pass such an act.

The only remaining question which deserves serious consideration is, whether the plaintiff in error, King, by the levy of his execution upon the mortgaged premises, and setting off the same before the mortgage in the present suit was recorded in the towns of Danbury and Brookfield, obtained a priority of title over the unrecorded mortgage. King had actual knowledge and notice of the mortgage, and of the execution, issue and delivery of the bonds the payment of which it was made to secure, at the time of such execution, issue and delivery; and he knew at the time he attached the mortgaged premises in the suit in which he obtained the judgment and execution by virtue of which the premises were set off to him, that the mortgage and bonds were outstanding and unsatisfied. That suit was founded upon certain judgments which had been assigned to him, and in some of those judgments Rucker, the president of the respondent company, who executed the mortgage, had an interest, and to the extent of that interest the suit was brought by King as the agent of Rucker. Rucker of course had knowledge of the mortgage and of the bonds at the time they were executed, issued and delivered. The debts out of which the judgments arose were contracted afterwards. Had King or Rucker under such circumstances and with such knowledge purchased the mortgaged premises and taken a deed of them or had taken a mortgage of the premises to secure the payment of their debts, it is perfectly clear, and indeed is conceded by the

counsel for the plaintiffs in error, that the mortgage upon which the present suit is founded, though unrecorded, would have been entitled to priority over the title acquired by their deed. No doctrine is better established than that the person who purchases an estate, though for a valuable consideration, after notice of a prior equitable right, makes himself a *malâ fide* purchaser, and will not be permitted, by getting in the legal estate, to defeat such prior equitable interest, but will be held to be a trustee for the benefit of the party whose right he has sought to defeat. *Le Neve* v. *Le Neve*, Amb., 436; 3 Atk., 646. But it is insisted by the plaintiffs in error that this doctrine, founded as it is upon the presumed fraud of the party becoming a purchaser under such circumstances, does not apply to attaching or execution creditors. The same claim was made in the case of *Carter* v. *Champion*, 8 Conn., 549, but it was left undecided. The court however held in that case that notice of an unrecorded deed, given to an attaching creditor of the grantor after his attachment and before the levy of his execution, could have no effect; for the creditor who had acquired a lien by his attachment could not be deprived of the effect of it by a subsequent act of another person. But it has been long settled in Massachusetts that a creditor who, with notice of a previous unregistered convey-ance executed for a valuable consideration, attaches or levies upon the estate conveyed as the property of the grantor, con-ducts himself fraudulently, and therefore acquires by his attachment and levy no title against the grantee. *Prescott* v. *Heard*, 10 Mass., 60; *Priest* v. *Rice*, 1 Pick., 164; *Coffin* v. *Ray*, 1 Met., 212; *Curtis* v. *Mundy*, 3 Met., 405; *Pomeroy* v. *Stevens*, 11 Met., 244; *Lawrence* v. *Stratton*, 6 Cush., 167, 169; *Sibley* v. *Leffingwell*, 8 Allen, 584. And the same doc-trine has been recognized by the courts of other states. *Daniels* v. *Sorrells*, 9 Ala., 436; *Dixon* v. *Lacoste*, 1 Sm. & Marsh., 70; *Taylor* v. *Echford*, 11 id., 21; *Walker* v. *Gilbert*, Freem. (Miss.) 85; *Morton* v. *Robards*, 4 Dana, 258. There are some authorities, however, which favor the doctrine con-tended for by counsel for the plaintiffs in error. But no doubt can be justly entertained that where, as in this case,

a party with notice of an unregistered conveyance, absolute or by way of mortgage, gives credit to the grantor or mortgagor, and subsequently attaches or levies an execution upon the entire estate to secure the payment of the debt thus created, he does an act against good conscience and in abuse of the statute, which was made to prevent, not to protect fraud, and therefore will not be allowed to acquire by his attachment or levy, or both, a priority of title over the unregistered conveyance. In giving credit to the grantor or mortgagor, under such circumstances, the creditor does not rely upon the property embraced in the conveyance for the payment of his debt. He is not deceived or misled by the absence of the conveyance from the records, because he has all the notice which the records are designed to afford; and he suffers no wrong or injury from the application of the rule which puts him in the predicament of a subsequent purchaser with notice of a prior unregistered deed.

There is, therefore, no error in the decree of the Superior Court, and it is affirmed.

In this opinion the other judges concurred.