Georgia Southern & Florida Railroad Co. *et al. v.* Mercantile Trust & Deposit Co. of Baltimore, trustee.
McTighe & Co. *v.* Macon Construction Co. *et al.*

1. There being in force a general law for the incorporation of railroad companies, if the subsequent special charters of the two railroad companies involved in this litigation were unconstitutional and therefore wholly void, each of said companies was nevertheless a corporation. *de facto,* and as such could acquire and own property and would be bound to its creditors by all acts which would have bound it had it been duly incorporated under the general law. Bonds issued by it, and deeds or mortgages made to secure the same, are enforceable to the same extent as they would be if no special charter had been granted and the company had been organized as a corporation in the method prescribed by the general law, and such bonds, deeds and mortgages had been thereafter executed. And any person making claim upon the assets of one of these corporations *de facto,* whether as its own creditor directly or as a creditor of such creditor or of a stockholder, sustains the same relation to it in respect to such claim as would be sustained under like circumstances were it a corporation *de jure.*

2. A corporation created under the general law of this State for incorporating railroad companies can bind, by mortgage or trust deed executed to secure bonds issued by it to provide funds for constructing its railroad, future acquired property as well as property owned by it at the time of the execution of the instrument. This being so, a corporation *de facto* can do the like.

3. A loan of $850.00 for the term of forty years is not rendered usurious by the lender taking from the borrower his bond for $1,000.00, bearing interest on that principal at the rate of 6 per cent. per annum, payable semi-annually, although the bond contained a stipulation that after 90 days default upon any one of the installments of interest, the whole of the principal should then become due and payable; it not being stipulated that in this event the lender was not to account for any interest received, whether by discount or payment, over and above 8 per cent. per annum on the principal actually loaned, and it not appearing that there was any device or contrivance to cover up usury, or any intent or expectation that default would be made in the payment of interest before the expiration of the full term of forty years. Nor would it matter that the bonds were not, in fact, delivered and the money received thereon till after a lapse of thirty-nine days, or less, from the date when the bonds began to bear interest at the six per cent. rate.

4. Where a railroad, forming a continuous line and located partly in this State and partly in an adjoining State, is mortgaged by a corporation (whether *de facto* or *de jure*) of which the courts of this State have jurisdiction, the mortgage consisting of a trust deed made to secure bonds issued by the corporation, the superior court of the county in this State having jurisdiction over the corporation may, in the exercise of its equitable powers, make a decree foreclosing the mortgage as to the corporate property embraced in it situate in both States, and may effectuate the decree by directing a sale of the whole property and the execution of a proper conveyance to the purchaser by the receiver, the trustee and the mortgagor. And if the fact be that the adjoining State has incorporated a company which has been consolidated under the forms of law with a corporation (*de facto* or *de jure*) of this State, and that this consolidated company executed the mortgage and is really the party before the court as the mortgagor, the truth of the case in this respect is admissible in evidence, and the jurisdiction is the same in all respects over the consolidated company as it would be over a corporation created exclusively under the laws of this State.

August 20, 1894.

Equitable petition, etc. Before Judge GAMBLE. Bibb superior court. November term, 1893.

This litigation was begun by petition in the nature of a creditors' bill filed by J. S. McTighe & Co. against the Georgia Southern & Florida Railroad Co., the Macon Construction Co., and others; under which petition a receiver of the defendant companies was appointed. Numerous interventions were filed, among them that of the Mercantile Trust & Deposit Company of Baltimore, trustee for the bondholders of the Georgia Southern & Florida Railroad Co., asking for foreclosure of the mortgages given to secure the bonds. It was agreed that this intervention was to be segregated from the main case and from the other interventions, and be tried separately. Said railroad and construction companies filed several pleas which were stricken on demurrer of the intervener. McTighe & Co. filed an amendment to their petition, attacking the charter of the railroad company on the ground that it was a special enactment of the legislature after the passage of the general act for the incorporation of railroads, and was void; and that the bonds and mortgages to secure them, made by the railroad company and held by the Mercantile Trust & Deposit Co., were likewise void. It was alleged that the construction company was the real owner of the railroad and its property; and that McTighe & Co. had never dealt with the railroad company, but all their dealing had been with the construction company as owner of the road, etc. This amendment was disallowed. The pleas of the construction company were similar to those of the railroad company, with the additional allegation that the former was the owner of all the stock and property of the latter. These pleas will be set forth, in substance, in the order of the head-notes ruling upon them.

1. The bonds held by intervener as trustee, or by the persons represented by it, and the mortgages sought to be foreclosed, are null and void and were made without authority of law, the railroad company never having

been properly and legally incorporated. The pretended charter of the railroad company was granted by act of the General Assembly approved September 28, 1881, amended by subsequent special act, such act of incorporation being unconstitutional and void, the General Assembly, prior to its passage, having passed a general law having uniform operation throughout the State, providing for the incorporation of any and all railroad companies. All the acts of the railroad company under said special law, including the borrowing of money and the execution of said bonds and mortgages, are void and not binding upon it.

2. The mortgage sought to be foreclosed was executed when the railroad had been completed for only the first twenty miles from Macon in the direction of Florida, and had obtained the right of way for the further construction of the road to Valdosta, Georgia, and no further. All the property of defendant from Valdosta to the line of the State of Florida, together with the rolling-stock belonging to it, was acquired by it after the execution of the mortgage; and defendant pleads that all said after-acquired property, and all property acquired after the execution of the mortgage, is free from the lien of the mortgage and not covered thereby.

3. The bonds held by intervener, or the persons represented by it, and the mortgages given to secure them, are infected with usury. The bonds were issued by the railroad company to the holders thereof on July 1, 1887, in the aggregate sum of $3,420,000, payable July 1, 1927, with interest at seven per cent. per annum from date, semi-annually on the first days of January and July, the principal indebtedness to become due, at the option of said trustee, upon the failure of the railroad company to promptly pay any interest installment at maturity, after ninety days from such default; while in point of fact the holders of the bonds loaned only $2,-

907,000, but charged and received interest on the entire $3,420,000 at the rate of seven per cent. per annum; it being stipulated in each of the bonds that said interest should be reserved and paid on the face or par value thereof, instead of the amount so actually lent by the holders of the bonds. The mortgages now sought to be foreclosed were given to secure the usurious interest so contracted to be paid, as well as the face or par value of said bonds. Therefore $513,000 of the aggregate amount called for by the bonds and secured by the mortgages, together with the interest on the $513,000 from the date of the bonds, which interest is also included in the bonds and mortgages, is usury, and plaintiff's demand should be reduced by the $513,000, together with the interest thereon and all interest paid on the $513,000 in the past, amounting to $189,550. The instruments executed by the railroad company for the purpose of securing the bonds, and in the petition to foreclose termed mortgages or deeds of trust, are in fact deeds attempting to convey into the intervener as trustee the absolute title to the property therein described, for securing the payment of the bonds, and by reason of the above recited facts, the bonds being infected with usury, said deeds or instruments given to secure the payment thereof are absolutely void. Of the bonds held by intervener, or by persons represented by it, 360 for $1,000 principal each, were dated and executed July 1, 1887, and 3,060 for $1,000 principal each, on July 24, 1888; the aggregate principal of all these bonds being $3,420,000. Though these bonds were dated and executed as aforesaid, they were not in fact issued or delivered on said date. The 360 bonds first mentioned were delivered January 19, 1888, and the parties to whom they were so delivered, and who now hold and own them, loaned this defendant on them and on the deed of trust executed cotemporaneously with them,

to secure their payment, $306,000; said loan having been made to this defendant on January 19, 1888, and the interest on the bonds being payable on the first days of January and July in each of the years during which they were to run, which interest was represented by coupons attached to the bonds, interest for nineteen days had accrued on the bonds, according to the tenor thereof, since the maturity of the coupons falling due January 1, 1888, and before said loan was made this defendant. The interest coupons which matured on July 1, 1888, represented the interest on the bonds from January 1, 1888, to July 1, 1888, and included the interest for the nineteen days from January 1 to January 19, 1888. These coupons were paid by this defendant in full, and no deduction was made for the nineteen days, nor was credit for the nineteen days interest allowed or contemplated at the time of the loan on January 19, 1888. This defendant only had the use of the money from January 19, 1888, and paid interest thereon and contracted to pay such interest from January 1, 1888. Defendant contends that the interest for the nineteen days was improperly required of it, as well as the $54,000 taken and reserved as discount in advance, both said sums being interest charged and paid for the first year of each loan and being usury. The amount of this interest so overcharged was $1,320. Similar claim is made as to the 3,060 bonds of the second issue above mentioned, the amount of interest or discount in advance claimed to have been taken as to these being $459,000, and the amount of interest overcharged, for the time between the date of issue and the date of delivery, being $19,380.

4. The mortgages or deeds of trust in question, dated January 3 and July 24, 1888, were in evidence. The only material portions of them are the recitals that the Georgia Southern & Florida Railroad Company, a rail-

way corporation under the laws of Georgia, was author-
ized by act of the legislature to consolidate with any
railroad in Florida, that the Macon & Florida Air-Line
Company, a railway corporation under the laws of Flor-
ida, had like authority to consolidate with any railroad
company in or out of Florida, that in pursuance of
the unanimous vote of the stockholders of the two rail-
roads, respectively, a consolidation thereof was effected,
and that the mortgage or deed of trust was executed by
the consolidated company known as the Georgia South-
ern & Florida Railroad Company, in favor of the trustee.
There are further recitals as to resolutions of the board of
directors, thereafter adopted and confirmed by the stock-
holders, authorizing the issuance of coupon bonds of
$1,000 each, secured by the mortgage or deed of trust
covering the railroad from Macon to Palatka, Florida,
with all its properties enumerated, etc.; and the provi-
sion, among others, that in default of the payment of in-
terest upon any of the bonds for a certain period, the
whole principal sum secured by the deed should become
due and payable, with the right in the trustee to sell the
property under certain regulations, or apply to any court
of competent jurisdiction to foreclose the mortgage, etc.
The intervener proved, over defendant's objections, that
the Macon & Florida Air-Line was duly incorporated
under the laws of Florida, and that said company and
the Georgia Southern & Florida Railroad Company were
duly consolidated as one railroad company operating a
railroad from Macon, Georgia, to Palatka, Florida; the
objections being that such evidence was irrelevant
and illegal, because the court had no jurisdiction over
the railroad and other property in Florida, or authority
to make any judgment concerning the same.   The same
ground of error was assigned upon the charge of the
court and upon the decree entered on the verdict finding
that the mortgages or deeds of trust should be foreclosed.

on the property in both States, and making directions.
for sale of the same.

ANDERSON & ANDERSON, for the railroad and construc-
tion companies.  HARDEMAN, DAVIS & TURNER, for Mc-
Tighe & Co.  HOKE SMITH, WASHINGTON DESSAU, STEED·
& WIMBERLY, BACON & MILLER, S. A. REID, GUSTIN,.
GUERRY & HALL, HILL, HARRIS & BIRCH and C. L. BART--
LETT, for .the trustee and other parties.

LUMPKIN, Justice.

The controlling questions presented in these cases are·
indicated in the head-notes.   How these questions arose·
will appear from an examination of the reporter's state-
ment.

We have not decided, and will not discuss, whether or·
not a special charter granted by the General Assembly to-
a railroad company after the passage of the general law
for the incorporation of railroad companies is unconstitu-
tional and therefore void.   Among many good reasons.
which might be stated for pursuing this course, and
which would doubtless be accepted as satisfactory, we
deem it sufficient to say it is not now necessary to pass
upon this question, it not being essential to a proper dis-
position of the present cases.   We wish it distinctly
understood, however, that we do not intend in anything
which follows to intimate any opinion whatever upon
this question, and if any expression we may use should
seem to do so, it must not be so construed.

1. If such a charter is unconstitutional, is not a com-
pany organized under it, at least, a *de facto* corporation,.
and as such capable of making contracts, acquiring and
owning property, and of becoming bound to its creditors
by all acts which would have been binding upon it had it
been duly incorporated under the general law?   We·
entertain no doubt at all, and will presently endeavor
to show, that this question should be answered in the·

affirmative; and if so, it will follow that bonds, deeds and mortgages executed by the *de facto* corporation are valid, not only as against the corporation itself, but also as against any one making a claim upon its assets, whether as a creditor directly of the corporation, or as a creditor of its creditors or stockholders. It is too well settled, both upon principle and authority, to require argument, that neither a *de facto* corporation, nor those who recognize and deal directly with it as a corporation, will be heard to deny its rightful corporate existence; and there is no good reason for applying a different rule to one claiming assets of a *de facto* corporation acquired solely in the exercise of corporate functions, but for the assumption of which there would have been no company of any kind, and, of course, no assets. Nor is it at all material whether the claim be made directly or indirectly. Whatever may be the manner in which it is presented, if the assets sought to be reached were in fact assets of a *de facto* corporation, the very act of making the claim puts the claimant in the same legal attitude as a direct creditor of the corporation; for such claimant has no better rights in the premises than his debtor of whose rights he seeks to get the benefit, and consequently can no more dispute the existence of the corporation than could the latter. So far, therefore, as the parties to this record are concerned, we have only to show that railroad companies operating in Georgia under special legislative charters granted after the passage of the general law referred to, are at least corporations *de facto*.

The fact that this very law was in force at the time the railroad companies involved in the present litigation obtained their special charters, makes it absolutely certain that even if these charters are mere nullities, lawful and valid charters might have been obtained for just such companies. In other words, there was beyond doubt legal authority in this State for incorporating

railroad companies with substantially the same rights, powers, duties and liabilities as those specified in the special charters. This is a most important fact, for where there cannot lawfully be a corporation *de jure,* there cannot be one *de facto.* This was distinctly ruled in Evenson *et al. v.* Ellingson *et al.,* 67 Wis. 634. "If an organization is completed when there is no law, or an unconstitutional law, authorizing such organization as a corporation," one who contracted with the organization is not estopped from denying its corporate existence. Heaston *v.* Cin. & Ft. W. R. R. Co., 16 Ind. 276. See, also, Snyder *v.* Studebaker, 19 Ind. 462, and cases there cited. In St. Louis &c. Ass'n *v.* Hennessy, 11 Mo. App. 555, it was held that one who had subscribed for stock in a supposed corporation prohibited by the State constitution was not estopped from denying its lawful existence. "Corporations cannot exist except by force of express law. A society that cannot be incorporated because organized to resist the enforcement of laws, cannot sue in its society name for the collection of a debt." The Detroit Schuetzen Bund *v.* The Detroit Agitations Verein, 44 Mich. 313. "A corporation organized under a void law cannot enforce a mortgage made to it; but if not organized for an unlawful purpose, a receiver for it can demand in equity an accounting for the debt purporting to be secured thereby." Burton *v.* Schildbach, 45 Mich. 504. "A corporation *de facto* cannot exist in the absence of a law authorizing its organization; and in such a case, the carrying on of the business in the corporate name is no evidence of *user* which can be considered in aid of corporate existence." Eaton *v.* Walker *et al.,* 76 Mich. 579. In this connection see, also, Scovill *v.* Thayer, 105 U. S. 143, and Norton *v.* Shelby County, 118 U. S. 425. One of the head-notes in the latter case is as follows: "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it

affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed"; and accordingly, it was held that the acts of a person assuming to perform the duties of an office which was created by an unconstitutional law, and therefore having no *de jure* existence, were utterly void.

We may assume, without further citation of authorities, and without attempting any argument on the subject, that where the existence of a corporation of a given kind is positively forbidden by law, or where there is no valid, constitutional law authorizing the creation of such a corporation, it cannot exist even as a corporation *de facto*. The rule thus stated does not, by any means, however, negative the soundness of the proposition that an organization assuming to be a corporation *de jure* but for sufficient reasons not so in fact, may be a corporation *de facto* when it is of such a character that it could, under existing laws, have full and complete corporate being and powers. The doctrine is thus broadly stated in Snider's Sons Co. *v.* Troy, 91 Ala. 224: "A corporation *de facto* exists when, from irregularity or defect in the organization or constitution, or from some omission to comply with conditions precedent, a corporation *de jure* is not created, but there has been a colorable compliance with the requirements of some law under which an association might lawfully be incorporated for the purpose and with the powers assumed, and a *user* of the rights claimed to be conferred by the law; that is, when there is an organization with color of law, and the exercise of corporate franchises and functions." In Stout *et al. v.* Zulick *et al.*, 48 N. J. Law, 601, s. c. 7 Atl. Rep. 362, it is said: "Where it is shown that there is a charter *or a law* under which a corporation, with the powers assumed, might lawfully be incorporated, and there is a colorable compliance with the requirements of the charter *or law*, and a *user* of the rights

claimed under the charter *or law*, the existence of a corporation *de facto* is established." The Supreme Court of Illinois, in McCarthy *v.* Lavasche, 89 Ill. 270, held, in substance, that even where a corporation has been formed under a charter which is unconstitutional and void, the stockholders would be estopped from urging this fact in order to defeat the collection of a *bona fide* debt against the corporation which a creditor is seeking to enforce under a provision of the charter making the stockholders liable individually. And see Hudson *v.* Green Hill Seminary, 113 Ill. 618, as to what will constitute proof of the existence of a *de facto* corporation. " A *de facto* corporation, that by regularity of proceeding might be one *de jure*, can sue and be sued; and a party who contracts with such corporation, while it is acting under its *de facto* organization, is estopped, in a suit on such contract, from denying such organization at the date of the contract." Heaston's Case, *supra*. The case of East Norway Lake &c. Church *v.* Froislie *et al.*, 37 Minn. 447, is strongly in support of the proposition that there may be a *de facto* corporation where there is a law under which a corporation of the particular kind might be formed; and the decision seems to have been made irrespective of the question whether, in organizing the corporation, there was an attempt to comply with the requisite legal forms or not. This case also holds that no private person will be allowed to attack collaterally the regularity of the organization of such corporation. " A party is estopped to deny the existence of a corporation at the time he contracted with it as such, if the corporation could constitutionally exist." Brookville &c. Turnpike Company *v.* McCarty *et al.*, 8 Ind. 392. In Missouri it had been held that even where a corporation is organized under a special charter, void because of a constitutional provision for incorporation by general law, a private party cannot

question its rightful existence when it is recognized by the State, the latter alone being allowed to raise the question. City of St. Louis *v.* Shields *et al.*, 62 Mo. 247. We find the following in Central A. & M. Ass'n *v.* Ala. Gold Life Ins. Co., 70 Ala. 120 : " When an association of persons is found in the exercise and *user* of corporate franchises, under color of legal organization, their existence as a corporation cannot be inquired into collaterally ; if the State acquiesces in the usurpation, individuals cannot complain." The general rule that private persons will not be allowed to attack collaterally the validity of a *de facto* corporation is supported by many authorities, among which may be mentioned 7 Atl. Rep., *supra*, and cases there cited in note; Duggan *v.* Colorado M. & I. C. Co., 11 Colo. 113, s. c. 17 Pac. Rep. 105, and cases cited ; Tar Riv. Nav. Co. *v.* Neal, 3 Hawks (N. C.) 520 ; Hasselman *v.* U. S. Mortgage Co. *et al.*, 97 Ind. 365, and authorities cited.

In addition to the numerous cases above noticed, we have examined a very large number of others decided in States other than our own, many of which are more or less pertinent to the question in hand. In some, there are expressions and rulings not entirely in harmony with the conclusion we have reached, but we think we have settled upon and announced the true law. Before concluding this division of the present opinion, we will briefly refer to a few of our own cases which support the doctrine here laid down. *McDougald, admx.,* v. *Bellamy, admr.*, 18 *Ga.* 411, recognizes the rule that a corporation, though unlawfully organized, is so far a valid corporation as to make it liable to creditors for its own acts. See, also, *Georgia Ice Co.* v. *Porter & Meakin*, 70 *Ga.* 637. In *Planters and Miners Bank* v. *Padgett et al.*, 69 *Ga.* 159, it was held that although a charter granted by the superior court to a manufacturing company was void, one who dealt with the company as a corporation

could not deny its corporate existence. Where one corporation has dealt with another company as a corporation, recognizing it as such, the first corporation is estopped from denying the existence of the second. *Imboden et al.* v. *E. & B. B. Mining Co.*, 70 *Ga.* 86. On page 107 Chief Justice JACKSON says: "This court, as indeed all civilized courts, has ruled that such recognition of a being—even of an artificial being—will stop the mouth of any other being, natural or artificial, from denying, in a case growing out of such recognition, that the being thus recognized ever had being." See, in this connection, *Lester* v. *G., C. & N. Ry. Co.*, 90 *Ga.* 802.

Our decision is not based upon the idea that the organization of these railroad companies under unconstitutional charters would make them *de facto* corporations, but upon the idea that the purpose for which they were organized being lawful and proper, if they had obtained charters under the general law and organized under them, which they might have done, they would, in substance, have done what they actually did; that is, they would have observed about the same forms and requirements in the one case as in the other. They undoubtedly attempted to organize according to *some* law, and did not set up to be corporations without pretense of legal authority. If the laws under which they proceeded were not good, they may, in our judgment, avail themselves of the existence of the general law on our statute book, and of its terms, at least so far as to enable them to be regarded as *de facto* corporations, because they have done practically what that general law required, though not actually following it nor professing to do so.

2. No question was raised as to the power of either of the railroad companies, under its special charter, to embrace in a mortgage property acquired after the execution of the mortgage. The right to mortgage "fu-

ture acquired property" was denied solely on the ground that these companies, being without legal charters, had no charter power for so doing, and that there was no other source from which such right could be lawfully derived. While it is true that section 1954 of the code in effect restricts (except as to stocks of goods or other things in bulk, but changing in specifics) the property which a mortgage may embrace to that "in possession, or to which the mortgagor has the right of possession," it is also true that the general law of this State for incorporating railroad companies expressly provides that a company created thereunder may, by mortgage or trust deed executed to secure bonds issued to provide funds for constructing its railroad, bind property acquired after the execution of the instrument. If we have succeeded in showing that these railroad companies, supposing their special charters to be void, are *de facto* corporations because of the existence of the general law, it would seem that they could make any contracts authorized by that law, and become bound by such contracts to those with whom the same were made. As a practical proposition, it is well known that most, if not all, of the railroads of any length in the United States which have been built for years past, have been constructed by issuing, in advance, bonds upon their entire lines, including the unbuilt portions as well as those already constructed, with mortgages to secure the bonds covering the whole. If a *de facto* railroad company is a corporation for any purpose at all, it ought, on general principles, to have the power to mortgage "future acquired property," and this seems to be the doctrine very generally recognized by the courts. Upon this question, see: Wright *v.* Bircher's ex'r, 72 Mo. 179; City of Quincy *v.* C., B. & Q. R. R. Co., 94 Ill. 537; Wade *v.* C. S. & St. L. R. R. Co., 149 U. S. 327; Williams *v.* Winsor *et al.*, 12 R. I. 9; Branch Sons &

Co. v. A. & G. R. R. Co. et al., 3 Woods (U. S. Circuit
Ct.) 630; Seymour et al. v. C. & N. F. R. R. Co., 25 Barb.
284; Holroyd v. Marshall, 10 H. L. Cases (Eng.), 191.
And these citations might be indefinitely multiplied.

3. The third head-note expresses the views we enter-
tain of the usury question presented.  A calculation will
show that if the bonds ran to full maturity, as contem-
plated, the lender of the money would not receive, in the
aggregate, as much as 8 per cent. per annum for the use of
the money, although at the beginning he put out on each
bond only $850.00, and at the end received $1,000.  The
$150.00 added to the 6 per cent. interest annually received
would not amount to as much as 8 per cent. per annum
on $850.00 for the full term.  That the bonds by their
terms bore interest from a date previous to their deliv-
ery, makes no difference, because, notwithstanding this
fact, the gross amount of interest for the full term would
not have been equal to 8 per cent. per annum.  So the
original contract, if the bonds ran forty years, was not
usurious; and it does not appear that they contained any
stipulation which would prevent a fair and legal adjust-
ment of the interest between the parties in case the
bonds became due earlier because of a default in pay-
ing interest.  Nor does in appear that in providing for
the maturity of the bonds in case of such default, there
was any device or contrivance to cover up usury.

The above is applicable if the railroad company is-
sued the bonds and borrowed money directly on them.
If that company delivered the bonds to the construction
company under a contract with it, the latter, of course,
had a right to sell them at any discount it pleased, and
there would be no usury in such a transaction.

4. Had the decree foreclosing the mortgage on the
Georgia Southern and Florida Railroad Company and
directing a sale of all its property in both States been
made by a court of the United States, its validity could

hardly be doubted.   The following Federal cases are conclusive upon this question, and we are confident there are others to the same effect: Randolph v. Wilmington & Reading R. R. Co., 11 Phila. 502; Blackburn v. Selma &c. R. R. Co., 2 Flippin, 525; Wilmer v. Atlanta & Richmond A. L. Ry. Co., 2 Woods, 409, 447; Muller v. Dows, 94 U. S. 444.   The opinion of Mr. Justice Strong, in the case last cited, is so clear and pertinent, we feel justified in making copious extracts from it: "If such a foreclosure and sale cannot be made of a railroad which crosses a State line and is within two States, when the entire line is subject to one mortgage, it is certainly to be regretted, and to hold that it cannot be would be disastrous, not only to the companies that own the road, but to the holders of bonds secured by the mortgage. Multitudes of bridges span navigable streams in the United States, streams that are boundaries of two States. These bridges are often mortgaged.   Can it be that they cannot be sold as entireties by the decree of a court which has jurisdiction of the mortgagors?   A vast number of railroads, partly in one State and partly in an adjoining State, forming continuous lines, have been constructed by consolidated companies, and mortgaged as entireties.   It would be safe to say that more than one hundred millions of dollars have been invested on the faith of such mortgages.   In many cases, these investments are sufficiently insecure at the best.   But if the railroad, under legal process, can be only sold in fragments; if, as in this case, where the mortgage is upon the whole line and includes the franchises of the corporation which made the mortgage, the decree of foreclosure and sale can reach only the part of the road which is within the State,—it is plain that the property must be comparatively worthless at the sale.   A part of a railroad may be of little value when its ownership is severed from the ownership of another part.   And the

franchise of the company is not capable of division."
The learned Justice further says that it is " undoubtedly
a recognized doctrine that a court of equity, sitting in
a State and having jurisdiction of the person, may de-
cree a conveyance by him of land in another State, and
may enforce the decree by process against the defend-
ant. True, it cannot send its process into that other
State, nor can it deliver possession of land in another
jurisdiction, but it can command and enforce a transfer
of the title. And there seems to be no reason why it
cannot, in a proper case, effect the transfer by the agency
of the trustees, when they are complainants. In McEl-
rath v. The Pittsburg & Steubenville Railroad Co., 55
Penn. St. 189,—a bill for foreclosure of a mortgage,—
in which it appeared that a railroad company, whose
road was partly in Pennsylvania and partly in West
Virginia, had mortgaged all their rights in the whole
road, the court decreed that the trustee who had brought
the suit, being within its jurisdiction, should sell and
convey all the mortgaged property, as well that in the
State of West Virginia as that in Pennsylvania. This
case is directly in point, and tends to justify the decree
made in the present case. The mortgagors here were
within the jurisdiction of the court. So were the trustees
of the mortgage. It was at the instance of the latter the
master was ordered to make the sale. The court might
have ordered the trustee to make it. The mortgagors
who were foreclosed were enjoined against claiming
property after the master's sale, and directed to make a
deed to the purchaser in further assurance. And the
court can direct the trustees to make a deed to the pur-
chaser in confirmation of the sale. We cannot, there-
fore, declare void the decree which was made."

The remaining question is, can a State court, in a case
of the kind now under consideration, with all the par-
ties at interest before it and having jurisdiction of the

corporation, decree a foreclosure and direct a sale of the entire railroad and the assets of the company in both States? We think that, taking the precautions and following the course indicated in the head-note, it can. The leading case in support of this proposition is that of McElrath *v.* Pittsburg & Steubenville R. R. Co., 55 Pa. St. 189, mentioned by Mr. Justice Strong. It is, for our purpose, squarely in point; and the fact that it was cited approvingly in a case decided by the Supreme Court of the United States, makes it a very strong authority. It would therefore seem immaterial whether the jurisdiction in question is exercised by a State or a Federal court. We deem it unnecessary to say more on this subject except to cite the following authorities which, to a greater or less extent, sustain the conclusion we have reached: Meade *et al. v.* N. Y. H. & N. R. R. Co., 45 Conn. 199; Hand *v.* S. C. R. R. Co. *et al.*, 12 So. Car. 314; Wood *v.* Goodwin *et al.*, 49 Me. 260; 3 Wood's Ry. Law, §474; Jones, R. R. Sec. §§413, 414.

If the foregoing views are sound, it follows, of course, that in admitting the evidence referred to in the head-note, no error was committed by our gifted brother GAMBLE, of the circuit bench, who handled with great skill these important and somewhat complicated cases.

*Judgment affirmed.*