HAWKINS *et al.*, trustees, *v.* THE MERCANTILE TRUST AND
DEPOSIT COMPANY OF BALTIMORE, trustee.

Where lots of land in a city were purchased by a railroad company
  with the intention and design of using the same for legitimate
  railroad purposes, in case the company should afterwards acquire
  other property, or in the event of certain anticipated contingen-
  cies, such lots became subject to the lien of a mortgage previously
  executed by the company, expressly covering property which it
  might acquire after the execution of the mortgage, and embraced
  in the following words of description therein: "All·things or
  property of any kind . . belonging to or used, or designed for
  use for or in connection with said railroad, . . . including as
  well all property and things whatsoever of any such nature or de-
  scription as above mentioned, belonging to or appertaining to or
  for use in connection with said railroad, . . which shall be
  hereafter acquired" by the company. This is true although, for
  proper and satisfactory reasons, it transpired after the purchase of
  the lots they were found unsuitable for railroad purposes and con-
  sequently were sold and conveyed to another person.
  August 12, 1895.

Equitable petition.    Before Judge FISH.    Sumter
superior court.    May term, 1894.

On April 1, 1889, the Savannah, Americus & Mont-
gomery Railway Co. executed a mortgage to the Mer-
cantile Trust & Deposit Co., as trustee, to secure the
payment of the bonds issued by the railway company.
This mortgage covered the railroad, "together with all
appurtenances and equipments, rights, privileges and
franchises unto the said railroad . . belonging or in
anywise appertaining, and the incomes, tolls, rents, is-
sues and profits thereof, including the roadway, right of
way and tracks, rails and ties and road-bed, side-tracks,
turnouts, switches, bridges, trestling, viaducts, culverts,
stations, depots, warehouses, water-tanks, machine-shops,
tools, locomotives, cars and equipment of all kinds
whatsoever, fences, offices, depot-grounds, engine-houses,
and all other buildings and structures, sand and gravel
pits and deposits of material, and all things or property

of any kind, nature or description whatsoever, real, personal or mixed, belonging to or used or designed for use for or in connection with said railroad between said points, including as well all property and things whatsoever of any such nature or description as above mentioned, belonging to or appertaining to or for use in connection with said railroad between said points described, which shall be hereafter acquired by the said party of the first part, or for or in connection with the said railroad between the said points, or with the working, use or occupation thereof, as such property and things are now possessed or owned by the said party of the first part for or in connection with the said railroad between the said points, or the working, use or operation thereof; and together with all the corporate rights and franchises," etc.   During the year after the execution of this mortgage, several lots of realty in Americus were purchased for the railroad company, and titles thereto taken in its name.   The purchases were made by Hawkins and others under his direction, he being an official of the railroad company and being also largely interested in the Americus Investment Co., which owned nearly all the stock of the railroad company.   The relations between the two companies were very close; there was no real conflict of interest between them.   According to the testimony of Hawkins, at the time of the purchases it was supposed that the property could or might possibly be used for railroad purposes, but it could hardly be said there was a definite purpose or intention to this end, as it was not known whether or not the railroad could reach the property for stores or warehouses, etc. The purchases were made with the understanding between the railroad and investment companies, that the latter should take the property at the prices paid, in case it turned out that the former could not utilize the same, there being various contingencies and uncertain-

ties such as the necessity of acquiring property intermediate between the railroad and the lands so bought. In 1891 and 1892, it appearing that the railroad did not need and could not use the property, conveyances were executed and recorded, from the railroad company to the investment company, which took the property for speculative purposes; and on December 22, 1892, after receivers had been appointed for the railroad company, the amount due it by the investment company for the property in question was charged against that company on the books of the railroad company, as a part of the November business. None of the property has ever been used for railroad purposes; it was not connected with the railroad, but somewhat remote therefrom; and an immense gully lay between some of it and the railroad. On October 24, 1892, the investment company executed a mortgage to Hawkins *et al.*, as trustees, to secure its bonds, covering, among other property, the lots here in question. Afterwards a decree was rendered in equity cause against the investment company, whereby a sale of its property was ordered to be made by a commissioner, who advertised and was proceeding to sell said lots. The trustee under the mortgage made by the railroad company thereupon brought a petition for the purpose of settling the question of title to the lots; and the case was submitted to the judge without a jury. He held that the lots were subject to the mortgage of the railroad company, and not subject to that of the investment company; which ruling was assigned as error.

J. E. D. Shipp, for plaintiffs in error.

Bacon & Miller, *contra*.

Lumpkin, Justice.

This case is controlled by the one decisive question upon which we have ruled. It was decided in the case

of *McTighe et al.* v. *Macon Construction Co. et al.*, 94 *Ga.* 306, 21 S. E. Rep. 701, that a railway company might lawfully execute a mortgage which would bind property acquired by the company after the execution of the mortgage. Recognizing this as sound legal doctrine, the question is: Did the mortgage made by the Savannah, Americus & Montgomery Railway Co. to secure the payment of its bonds cover the city lots involved in the present controversy? The terms of the mortgage which are pertinent to this inquiry are quoted in the head-note. We construe this language to mean that the mortgage was to include "after acquired property" which was "designed for use for or in connection with" the railroad. The record plainly discloses that the lots in dispute were, at the time of their purchase by the railway company, undoubtedly designed for legitimate railroad uses and purposes in certain contingencies. We cannot see that it makes any difference, in determining the question whether or not the lots came under the mortgage, that these contingencies did not happen. At the time the lots were purchased with the company's funds, there was certainly some design or intention to use them "for or in connection with" the railroad itself. Otherwise they would not have been purchased at all. Nor does it matter that, for amply sufficient reasons, it afterwards transpired that the lots were unsuitable for railroad purposes, and were consequently disposed of by sale. In our judgment, they became subject to the mortgage the moment they were purchased by the railway company; and the trial judge was right in so holding.                                    *Judgment affirmed.*