## GEORGIA SOUTHERN AND FLORIDA RAILWAY COMPANY *v.* BARTON *et al.* (Two cases.)

1. Authority to mortgage "a part or the whole of its entire property and franchise" does not empower a railroad company to mortgage its "income, rents and profits."

2. Where the charter of a railroad company in express terms defines and limits its power to mortgage, a general provision in a preceding section of the charter authorizing the company to build a railroad "and the same to use, equip, and enjoy all the rights, privileges and immunities granted to" another named railroad company, does not confer upon the former company the mortgaging power of the latter under its charter.

3. Section 1689 (i) of the Code of 1882, which confers upon any railroad company incorporated under the general law, of which this section is a part, power to mortgage its "railroad-track, depots, grounds, rights, privileges, franchises, immunities, machine-houses, rolling-stock, furniture, tools, implements, appendages and appurtenances, used in connection with such railroad or railroads, in any manner then belonging to said company, or which shall thereafter belong to it," gives no power to mortgage income, because the mortgaging power expressed in the language of this section applies only to specified kinds of property, not including income, in possession when the mortgage is executed, and to like kinds of property to be thereafter acquired.

4. It results from the foregoing that the mortgaging power of the Georgia Southern & Florida Railroad Company, whether derivable from its special charter or from the general law for the incorporation of railroads, did not include authority to mortgage its income; and though it executed a mortgage purporting to cover the same, and this mortgage was foreclosed accordingly, its lien did not, as to third persons not bound by the judgment of foreclosure, attach to such income.

5. Under the special facts of this case, the present intervention, growing out of the main equitable proceeding in consequence of which the property of this railroad company was brought into court for administration, should not be held to be a "traders' bill" against that company; and the rights of the parties now before the court are to be determined just as if this was an ordinary contest over a fund in court between a mortgagee whose mortgage had been foreclosed and a judgment creditor of the mortgagor.

6. This being the nature of the case, the trial judge rightly held that the judgment creditor was entitled to preference, he having a lien attaching to the fund in controversy, and the contestant's right thereto depending upon the alleged priority of a mortgage which, relatively to this judgment creditor, had no lien upon such fund.

7. Upon the theory that the mortgages dealt with in the case of *Green* v. *Coast Line Railroad Co.*, 97 *Ga.* 15, had no lien upon the income of that company because of a want of authority on its part to mortgage income, the present decision and the decision in that case are in complete accord. In so far as the decision in that case lays down the doctrine that, even if

the mortgage did cover income, the lien of the judgment creditor was nevertheless entitled to priority, it is not applicable to the case now in hand.

Argued February 25-26, — Decided August 7, 1897.

Equitable petition—intervention. Before Judge Felton. Bibb superior court. April term, 1896.

*John I. Hall*, for plaintiff in error.

*Dessau, Bartlett & Ellis* and *Hardeman, Davis & Turner*, contra.

LUMPKIN, P. J. On the 30th day of January, 1888, the Georgia Southern & Florida Railroad Company executed and delivered to the Mercantile Trust & Deposit Company of Baltimore, as trustee, a mortgage to secure the payment of certain bonds issued by the mortgagor. This mortgage was duly recorded, and purported to create a lien " on all the property, franchises and rights of said railroad company, and on its income, rents and profits." Certain creditors of the Macon Construction Company instituted against it in the superior court of Bibb county an equitable petition under which, on the 14th day of March, 1891, a receiver was appointed to take charge of and administer its assets. This receiver seized and took possession of all the property, both real and personal, of the above named railroad company; and in the litigation which followed, this property was, for many purposes, treated and dealt with as assets of the construction company. The trustee for the bondholders, on March 30, 1891, obtained an order allowing it to be made a party to the case, simply for the purpose of filing "such pleadings in the future in its own behalf as may be legal and just." On May 23, 1891, Barton obtained a judgment against the railroad company in an action for personal injuries, which was commenced October 14, 1890; and on May 25, 1892, Finney obtained against this company a judgment in a similar action brought December 19, 1891. Neither Barton nor Finney was, or had ever been, a party to the equitable proceeding above mentioned, at the time the judgment in his favor was rendered. Both subsequently became parties, as will hereinafter appear.

On October 12th, 1892, the trustees began active proceed-

ings for the foreclosure of the mortgage, and filed an intervention for that purpose, which resulted, on November 17th, 1893, in a judgment of foreclosure establishing in favor of the mortgagee a lien upon all the property described in the mortgage, including income realized from the operation of the railroad. At a sale had under this judgment, all the property of the railroad company, including its franchises and rights of every kind, was sold at public outcry and bought by the bondholders. This sale was confirmed, and the decree of confirmation provided that the receiver and the commissioners appointed to conduct the sale should make to the purchasers a proper conveyance. This decree also provided that the income in the receiver's hands at its date should be turned over to the commissioners "to be applied to the payment of such claims as might be adjudged to have priority over the bonds, . . the surplus, if any, after paying such claims, . . to be turned over to the holders of the bonds." After all these things had occurred, Barton and Finney filed separate interventions, setting up therein that as to income in the receiver's hands their judgments were entitled to precedence over the claim of the bondholders. The Georgia Southern and Florida Railway Company, which had in the meantime been organized, and which was the successor in right to the purchasing bondholders, became a party and contested these interventions. The trial court, upon the facts above stated, held that the judgments in favor of Barton and Finney were entitled to payment out of the income, and the railway company excepted.

This court agrees with his honor, Judge Felton, in the conclusion he reached; and we will now proceed to deal with the legal questions presented, the proper solution of which we think leads necessarily to an affirmance of the judgments under review.

1, 2. In the first place, we hold that the Georgia Southern & Florida Railroad Company had no authority of law to mortgage its "income, rents and profits." It was claimed by the plaintiff in error that this company did have such authority under a legislative charter embraced in an act passed September 28, 1881, which, in the 4th section thereof, ex-

pressly conferred upon it the power "to issue mortgage bonds of the company, in such form as the directors may prescribe, upon a part or the whole of its entire property and franchise." See Acts of 1880–1, pp. 277, 278. It was earnestly insisted that a grant of power to a railroad company to mortgage its franchises necessarily includes power to mortgage income. Whatever may be the law in other jurisdictions, we are satisfied that section 1954 of the Code of 1882 (which embodies the law of force when this mortgage was executed) settles this question adversely to the contention of counsel for the plaintiff in error. Under the provisions of that section, a mortgage can lawfully embrace only "property in possession, or to which the mortgagor has the right of possession at the time" of executing the mortgage, save only as to stocks of goods or other things in bulk but changing in specifics. Under this law, therefore, neither a corporation nor a natural person has the right to mortgage property which may be acquired after the execution of the mortgage; and as income to be made is necessarily in the nature of a future acquisition, we think it quite clear that the authority conferred upon this company in the language above quoted from its special charter did not give it any power to mortgage its income, rents or profits.

It was, however, further urged that other language contained in this special charter conferred upon the company the right to mortgage "after-acquired property." The 2d section of the act in question gave the company authority to build a railroad from the city of Macon to Homerville or Dupont, in Clinch county, and thence to the Florida line, "and the same to use, equip, and enjoy all the rights, privileges, and immunities granted to the Central Railroad and Banking Company of Georgia, except banking privileges, and except exemption from taxation, and subject to the same liabilities imposed upon said company." It appears that in 1872 the General Assembly empowered the Central Railroad and Banking Company of Georgia, and other companies, "to mortgage or convey in trust, by way of mortgage, all their property, estate, rights, privileges and franchises, now or hereafter to be held or granted." See Acts of 1872, p. 331. While the language

last quoted is apparently broad enough to include the power to mortgage income, we do not think this power was conferred upon the Georgia Southern & Florida Railroad Company by virtue of the provision in its charter to which reference is last above made. As will have been observed, this charter, in the 4th section, undertook to deal specifically with the mortgaging power intended to be conferred upon this company; and accordingly the act in express terms defined and limited the power to mortgage, and in so doing confined the operation of this power to "a part or the whole of its entire property and franchise,"—that is, so far as relates to property, to such only as the company might have in its actual possession, or have the right to possess, at the time of executing the mortgage. We are therefore quite sure that the mortgaging power of the Central Railroad and Banking Company was not in contemplation, and that no reference to it was intended, when that provision of the charter was inserted, granting to the Georgia Southern & Florida Railroad Company, with specified exceptions, certain rights, privileges and immunities which had been previously conferred upon the Central company. The rights, etc., here referred to, were obviously those which pertained to surveying, laying out and building the railroad, selecting the line of its route, acquiring and condemning land for rights of way, and other privileges and franchises of a like general nature. The General Assembly was, we think, in the 2d section of this special charter, simply undertaking to confer these general rights and nothing more; for if it had, by the language employed, designed conferring upon the new company the mortgaging power enjoyed by the Central Railroad and Banking Company, there would have been no occasion whatever for specifically defining and setting forth in another section of the charter the power which the Georgia Southern and Florida Railroad Company should have as to creating mortgages. Indeed, we think the conclusion is irresistible, that the General Assembly intended to state in express terms exactly what this power should be. Another reason for this conclusion is, that if the 2d section of the act was designed to confer power upon the company to mortgage "after-acquired

property," the power thus given would have been greater than that conferred in the 4th section, which, as has been seen, limited the mortgaging power to property in existence and owned by the company at the time of executing the mortgage. Two such powers could not consistently stand together; and it is hardly to be presumed that the legislature intended to stultify itself by placing directly · conflicting provisions in such close proximity to each other in one short act.

The act of October 16, 1885 (Acts of 1884–5, p. 268), amending the charter of this company, adds no strength whatever to the contention that the company acquired the mortgaging power of the Central Railroad and Banking Company. This last act did not undertake to deal in any manner with the mortgaging power. Among other things, it in the 2d section provided for certain changes in the proposed direction of the railroad, and then declared how this section would read when thus amended. In setting it forth in its amended form, there was simply a retention of the language relating to the rights, privileges and immunities of the Central Railroad and Banking Company, exactly as it stood in the original act before the amendment in question was introduced.

3. In *Georgia Southern & Florida Railroad Co.* v. *Mercantile Co.*, 94 *Ga.* 306, it was held, that even if the special charter of this railroad company was unconstitutional, it could, as a de facto corporation, issue bonds and execute a mortgage to secure the same under the provisions of the general law of this State for the incorporation of railroad companies. The provisions of that general law, embraced in section 1689 (i) of the Code of 1882, conferring upon railroad companies the power to mortgage, is quoted in the third headnote. An examination of the language in which this power is expressed will readily disclose that it confers no power to mortgage income. The power is given to mortgage a number of enumerated kinds of property "then [that is, at the date of the mortgage] belonging to the company, or which shall thereafter belong to it." In other words, property of like kinds which the company may subsequently to the execution of the mortgage acquire may also be included in a mortgage covering property of this description

already in possession. Among the specified kinds of property either owned or to be acquired upon which the company may place a mortgage, income is not included; and we therefore without difficulty come to the conclusion, that even if the section of the code last above mentioned may properly be looked to in ascertaining the extent of the powers and privileges enjoyed by the Georgia Southern & Florida Railroad Company, no power on its part to mortgage income is derivable therefrom.

4. We have not undertaken, because it has not been at all necessary to do so, to decide whether the special legislative charter of this company is, or is not, constitutional. We have, however, in looking to it, and also to the general law for the incorporation of railroads, exhausted all possible sources from which this company could derive any authority to create a mortgage; and we think we have made it appear that neither in the special charter (assuming it to be valid) nor in the general law (upon the theory that it is applicable) is there any express authority, or authority arising from necessary implication, which could properly be held as empowering this company to mortgage its income.

5, 6. The equitable petition in which the interventions now under consideration were filed can in no proper sense be treated as a "traders' bill" against the Georgia Southern & Florida Railroad Company. As between the original plaintiffs, creditors of the Macon Construction Company, and the latter company, it could properly be so regarded. The mere fact, however, that a receiver of the original defendant seized the property of the railroad company and administered the same as assets of the construction company does not place creditors of the railroad company, coming in by intervention and as such claiming assets belonging to the railroad company, in the same position as creditors of the construction company, making contests over the proceeds of the railroad company's property as assets of their debtor; nor does such fact give to these latter proceedings the character of a creditors' petition. As between the trustee of the bondholders and Barton and Finney, this case should be treated as if the trustee had instituted an original foreclosure proceeding, had sold

the property, and a portion of its proceeds, while in the hands of the court for distribution, was being claimed by Barton and Finney under their respective judgments. Thus viewing the matter, the foreclosure proceedings should not be regarded as having been commenced until the 12th of October, 1892; for the first appearance of the trust company in the case, as will have been seen, was merely passive. Fixing the date last mentioned as that upon which the proceedings to foreclose the mortgage really began, it will be noted that Barton and Finney had already, before that time, reduced their claims against the railroad company to judgment. On the whole, therefore, the rights of the parties now before the court should be determined just as if this was an ordinary contest over a fund in court between a mortgagee whose judgment had been foreclosed and a judgment creditor of the mortgagor. Dealing with the case from this standpoint, the only conclusion which, in view of what is above laid down, could properly be reached is, that the judgments of Barton and Finney were, in preference to the bondholders' claim, entitled to payment out of the fund in the commissioners' hands arising from income. These judgments constituted valid liens upon all the property of the railroad company; not, of course, capable of enforcement by levying the same upon the money in the commissioners' hands, but certainly capable of being made effectual by an appropriate equitable decree.

The trustee of the bondholders, as between itself and the railroad company, had a good judgment binding both the corpus and income; but the lien of this judgment could not in any manner affect the rights of either Barton or Finney, who were not parties to the proceeding at the time this judgment was obtained, but who subsequently filed their respective interventions for the very purpose of setting up this fact and claiming that, as between themselves and the bondholders, they were entitled to be paid out of the fund in court awaiting distribution in conformity to the court's decree providing that it "be applied to the payment of such claims as might be adjudged to have priority over the bonds." As has been seen, their claim of preference was well founded. Relatively to

them, the mortgage which had been foreclosed was not a lien upon the fund out of which they asked payment; and they having a lien upon it, and the trustee of the bondholders (as to Barton and Finney) having none whatsoever, equity necessarily gives them the preference.

7. This court was asked to review the decision made in the case of *Green* v. *Coast Line Railroad Co.*, 97 *Ga.* 15. The brief statement contained in the 7th headnote with respect to this case will suffice to show that a review of it is not essential to a proper determination of the case now before us, and would therefore be both unprofitable and inappropriate.

*Judgment in each case affirmed.   All the Justices concurring.*