Dieter, administratrix, *v.* Estill *et al.*

1. Even if, after the passage of the general law (Code, §1689(a) *et seq.*) for the incorporation of railroad companies, the General Assembly could not constitutionally grant a special charter to a railroad company of the kind contemplated by the provisions of that law, inasmuch as that law is not applicable to street railroad companies the General Assembly could, after its enactment, constitutionally grant a special charter to a railroad company of the latter kind, and in doing so, could authorize such a company to extend its line to a suburban terminus beyond the limits of the town or city in which the same was to be located.

2. It affirmatively appearing that the acts complained of in the plaintiff's petition were not done by the defendants, but by a duly incorporated company, the court was right in refusing to grant the injunction.

February 5, 1895.

Petition for injunction. Before Judge FALLIGANT. Chatham county. July 31, 1894.

BARROW & OSBORNE, for plaintiff.

A. C. WRIGHT, WEST & McLAWS and CHARLTON, MACKALL & ANDERSON, for defendant.

ATKINSON, Justice.

Plaintiff filed her petition against the defendants in Chatham superior court, alleging that she was the owner of a certain tract of land situated outside of the city of Savannah; that some of the defendants had procured the passage of an act of the legislature, approved November 3d, 1889, incorporating the Savannah and Isle of Hope Railway Company, by the terms of which this company was authorized to construct a railroad from a certain point in the city of Savannah, through divers of its streets and lanes, into the country, and thus in the county of Chatham to the Isle of Hope—the terminal point last named being situated outside of the corporate limits of the city of Savannah, and with the further privilege of constructing a street railroad through certain of the streets of the city of Savannah; that other of

the defendants had procured the passage of an act by
the General Assembly, approved December 9th, 1890,
incorporating the Electric Railway Company of Savan-
nah, and authorizing the construction within the city of
Savannah, upon certain of the streets, routes and ways
therein as the mayor and aldermen might thereafter
authorize, of a street railway ; that there was, subsequent
to the construction of the railways provided for by these
charters, an arrangement made whereby the Electric
Railway Company of Savannah was operating the Sa-
vannah and Isle of Hope railway in connection with its
system of street railways already then existing in the
city of Savannah.   It was alleged that this plaintiff was
the owner of certain premises upon the line of the Sa-
vannah and Isle of Hope railway; that these railways
were operated by electricity, and that, without condem-
nation and without just compensation, the persons con-
trolling the franchises of the two railway companies had
erected upon her premises certain electric poles, main-
taining thereon, without her consent, a continuing nui-
sance; and she therefore prayed that they be enjoined
from the maintenance of this nuisance.   The defendants
were sued and served as individuals, the plaintiff alleg-
ing in her declaration that as to the wrongful act of
which she complained they were partners and tort-
feasors; she further alleging that the grant of the char-
ters to these railway companies by acts of the General
Assembly was void, because the legislature, previous to
the passage of these acts, had passed a general law for
the incorporation of railways by the act of 1881, em-
bodied in section 1689(a) *et seq.* of the code, and had
thereby conferred upon the secretary of state authority
to issue certificates of incorporation to railway compa-
nies; 'and because of the constitutional prohibition
against the passage of special statutes where there was
already of force a general law making provision for the

same subject. The defendants answered, denying their liability as individuals for the wrongful act complained of; substantially admitted the maintenance of the nuisance as stated in the plaintiff's declaration; but showed for cause against the grant of an injunction as against themselves as individuals, that the wrongful acts complained of were committed by the corporation along whose line the poles were erected. The circuit judge upon the hearing of the application for injunction, upon the coming in of the answer, refused to grant a temporary injunction; and the cause is here for review.

The maintenance by one person of a continuing nuisance upon the premises of another, without his consent, gives a right of action. It is a good reply to such an action, however, that the tortious act was committed by some person other than he against whom the plaintiff has declared. The admitted facts show that these several acts were committed by the railroad companies; and if the charters of these companies be valid, even though these defendants may have been the corporators and stockholders therein, they could not be held personally answerable to the plaintiff for the wrongful act of the corporations. We do not think the contention of plaintiff's counsel, that these acts of incorporation are void, is well founded. Prior to the passage of the act of 1881, the power to grant charters to railway companies inhered in the General Assembly as the depository of the sovereign legislative will of the people. To divest itself of this authority, and confer it upon another body, the legislature must have expressed itself in the clearest and most unequivocal of language. In order to divest itself of this, one of the highest attributes of its sovereign power, its expressions upon that subject must have been so clear and convincing as to express indubitably its intention so to do. The constitution of the State of Georgia, in dealing with the subject of the construction

of railroads, treats the two classes of railroads as being ntirely separate and distinct. The power generally is reserved in the General Assembly by that instrument to grant charters to railway corporations, but there is a prohibition upon the power of the General Assembly to grant charters to street railway companies, except upon certain conditions, and the conditions expressed are in the following language (section 5079 of the code, par. 20, art. 3 of the constitution): "The General Assembly shall not authorize the construction of any street passenger railway within the limits of any incorporated town or city, without the consent of the corporate authorities." This limitation operates against the power of the General Assembly to authorize the construction of a passenger railway within the limits of incorporated towns or cities, thus recognizing the distinction between those passenger railways employed for the transportation of passengers within the limits of cities, and those railways designed for the accommodation of the general commerce of the country between distant points. It was the purpose of the constitution to leave with the city authorities the right to select those streets along which, without inconvenience to the general public in populous cities, these street railways could be operated. The act of 1881 to which we have heretofore referred contains no provision of this character. There is no requirement of this act that before the secretary of state shall issue a certificate of incorporation, the consent of the municipal authorities shall be first obtained to the act of incorporation, without which consent no charter could be granted to such railway even by the General Assembly itself. We are not to presume that the General Assembly intended to confer upon the secretary of state a power which it did not itself possess. The omission to provide this as one of the prerequisites to the grant of a charter

by the secretary of state, affords the strongest inference that the legislature did not design to confer upon the secretary of state any authority with respect to street railways. If that act be held to authorize the incorpotion of street railways, by its terms the secretary of state may proceed with or without the consent of the municipal authorities, and this would be manifestly in violation of the constitution. An analysis of the whole scheme of legislation outlined in this general law, indicates a fixed legislative purpose to confine the power therein conferred upon the secretary of state to the granting of charters for the construction of railroads for the transportation of passengers and freight between the different sections of the State. In the formation of a company it is required that publication of the application shall be made in a daily paper in each of the several counties through which the proposed line extends. The articles of association are required to state the name of the company and the places from which the road is to be constructed or maintained, the length of the road, the name of each county in the State through which or into which it is made or intended to be made; thus indicating that in the legislative mind the idea was uppermost that the road should connect different places—that it would be built through different counties. The provision for crossing other railroads at other than grade points, the width of its right of way stated at two hundred feet, and the right to cut down trees that might be in danger of falling on the track or obstructing the right of way, the right to maintain docks, stations, etc., all of these things indicate that the legislature was dealing with railroads other than mere street railroads. Railroads other than mere street railroads constructed between different places in the same county, might properly be incorporated under a certificate from the secretary of state; but where in connection with its suburban

line it is designed to confer upon it the power by its charter within the limits of a city to construct and operate a street railroad along the streets and lanes of such city, the power must be conferred by the General Assembly. To have one main line leading into a city for the accommodation of the commerce of that city with the outside world, is one thing; and to appropriate its streets and public thoroughfares for regular passenger traffic therein by a system of street railways, is entirely a different thing. The legislature might well have designed to grant to the secretary the power to issue certificates of incorporation to the one, and reserved to itself the power to determine upon the propriety of granting the other. The interpretation placed upon its constitutional power by the General Assembly itself from time to time is in harmony with the views herein expressed. The vast number of charters granted to street railway companies by the General Assembly since the passage of the act of 1881, indicates clearly that according to the legislative mind the General Assembly alone had the power to grant these charters. The charters of both the railway companies in question here contemplated the construction and maintenance within the city of Savannah, by and with the consent of the corporate authorities, of a system of street railways. One of these companies had within the city limits a complete system of railway; and the other, with the power to construct such a system within the city, had in fact constructed its suburban line to the Isle of Hope. The traffic arrangement by which these corporate interests were amalgamated did no violence to any rule of law, and was an act which by the several corporators and stockholders could have been legally performed. The answer shows that the organization of the corporations was regular. No question is made in this court upon that point; and inasmuch as the acts complained

of were committed by these companies in the exercise of their corporate functions within the limits conferred by their charter, if a wrongful act were committed in the maintenance of a nuisance upon the land of this plaintiff, the suit should have been brought and the prayer for injunction should have been against the corporations themselves.

These considerations, taken in connection with the general presumptions which must always be indulged in favor of the constitutionality of statutes, lead us to the conclusion that in the denial of an injunction as against these individual defendants the court rendered a proper judgment; and it is therefore            *Affirmed.*