BROWN *v.* ATLANTA RAILWAY AND POWER COMPANY.

1. The act of August 31, 1891 (Acts 1890-91, vol. 1, p. 169), providing that " all charters heretofore granted by the secretary of State to street and suburban railroad companies are hereby confirmed and declared to have had full effect from their dates," was in effect a general law giving the consent of the General Assembly that street and suburban railroad companies theretofore organized under the charters referred to might, in the future, exercise the corporate powers mentioned in such charters ; and with this legislative consent such companies became, after either an express or an implied acceptance of the provisions of the act, de jure corporations, with all the powers granted in the charters ; and this is true whether the charter in a given case was originally granted without authority of law or in violation of law.

2. The General Assembly had in 1891 authority to grant corporate powers to a street-car company, though the consent of the corporate authorities of the town or city in which the lines of street-railway were to be located had not been first obtained ; but the grant of such powers did not authorize the construction of a line of street-railway upon the streets of any town or city until the consent of the corporate authorities had been obtained.

3. That a corporation may have acquired a portion of its property in violation

of law is not a sufficient reason for enjoining it from exercising its legitimate corporate powers, at the instance of a private citizen whose property will be damaged by the exercise of such powers.

4. Following the decision of this court in *Moore* v. *Atlanta*, 70 *Ga.* 611, this court will not control the discretion of the trial judge in refusing to grant an interlocutory injunction which would interfere with a public improvement in which no part of the property of the applicant is actually taken, although there was evidence before the judge authorizing a finding that the property of the applicant would be damaged by the improvement.

5. Even if in 1891 the General Assembly had no power to confer upon street-car companies the authority to become common carriers of freight, the grant of such authority would not in any way affect other powers which had been lawfully granted to such companies.

6. A street-car company which has acquired the lines of street-railway of two other companies may, when authorized by its charter, and with the consent of the authorities of the city in which its lines of railway are situated, connect the lines acquired from the other companies by laying its tracks upon such portions of a street of the city as may be necessary to make the connection.

7. A street-car company having authority to lay its tracks along the streets of a city will not be enjoined from laying its tracks along a given street, at the instance of one claiming to have an interest in a line of street-railway in another street, on the ground that the construction of the new line may operate as an abandonment of the line in which he is interested.

8. The lawmaking body of a municipal corporation may pass a special ordinance which is in conflict with a prior general ordinance, when there is nothing in the charter prohibiting this kind of legislation.

9. A general power in the charter of a street-railway company to construct a line of street-railway authorizes the construction of double tracks upon the streets of a city, provided the authorities of such city consent that the streets may be so used.

10. The rulings on the admission of evidence were free from error, and no sufficient reason for a reversal of the judgment has been shown.

Argued April 30, — Decided May 20, 1901.

Petition for injunction.    Before Judge Lumpkin.    Fulton superior court.    March 1, 1901.

This was a petition against the Atlanta Railway and Power Company, the Metropolitan Street Railroad Company, and the Atlanta Street Railroad Company, to prevent the construction of a street-railway line in front of the plaintiff's premises on Washington street in the City of Atlanta, and the making of a connection between the lines of the two companies last mentioned, the removal of tracks and the change of routes and schedules on Woodward avenue, on Pulliam street, and on Clarke street from Pulliam to Washington street; also the use of the franchises and track of the Metropolitan Street Railroad Company by the Atlanta Railway and Power Company.    The court refused an injunction, and the plaintiff excepted.

The plaintiff owns and resides on a lot at the corner of Washington and Rawson streets.  He owns also a lot on Pulliam street, in the same block with the other.  Washington and Pulliam streets are parallel and run north and south, and Pulliam is west of Washington.  Rawson street is the southern boundary of this block; the next street which crosses Washington north of Rawson is Woodward avenue, formerly Jones street; and the next cross street south of Rawson is Clarke street.  There is no street-car line on Washington street between Woodward avenue and Clarke street.  There is one extending to Woodward avenue along Washington street from the north and the center of the city, then along Woodward avenue eastward for a distance of two blocks to Capitol avenue, which is parallel to Washington street, and along Capitol avenue southward, which line was built and originally operated by the Atlanta Street Railroad Company, under a charter granted in 1866; and there is a line, subsequently established, from Clarke street southward on Washington, extending from the center of the city to and along Pulliam street to Clarke and along Clarke to Washington, which line was built and originally operated by the Metropolitan Street Railroad Company, under a charter granted in 1882, which defined its route (Acts 1882–3, p. 201).  One share of stock of the last-mentioned company is owned by the plaintiff, who has held it since 1890.  In 1891 Hurt and others filed in the office of the secretary of State articles of association for the purpose of forming a corporation to be known as the Atlanta Consolidated Street Railway Company; and a certificate of incorporation was issued to them, under which the railroads of the Atlanta Street Railroad Company and the Metropolitan Street Railroad Company, with other lines which the incorporators had obtained control of, were consolidated and operated under one management.  In 1892 the property and franchises of the Metropolitan Street Railroad Company were bought by the Atlanta Consolidated Street Railroad Company at a receiver's sale, made under an order of court, and the sale was confirmed by the court.  In 1899, on the application of the Atlanta Consolidated Street Railroad Company to the secretary of State, its charter was amended by changing its name to the Atlanta Railway and Power Company.  In August, 1900, on the application of the Atlanta Railway and Power Company, authority was granted to it by a municipal ordinance "to extend its line of street-railway on Washington

street from Woodward avenue to Clarke street, by laying single or double tracks on said portion of Washington street;" and the ordinance provided that, inasmuch as the work permitted to be done was a straightening, rather than an extension, of the lines of the company, the acceptance of this grant should not be held to place its lines under the operation of the general street-railway ordinance approved August 22, 1899, which imposes certain burdens on all existing street-railway companies applying for and accepting privileges to construct a new line, to extend an existing line, or to connect to one otherwise held to be an existing line.    An extension of the time for laying tracks was subsequently granted, and in pursuance of the authority thus granted work on the tracks was begun; whereupon this petition for injunction was presented.

The petition alleges, in substance, that the running of the street-railway line in front of the plaintiff's premises will be a nuisance, and will result in irreparable damage to him.    Allegations are made as to damage from noise and dust incident to the running of the cars, and damage from the cutting off of safe entrance and exit for vehicles to and from his premises, by reason of the narrowness of the street and the proximity of the track to the curbstone; also damage from the electric wires by which the cars would be operated; and it is alleged that no compensation has been paid or tendered for damage to his property.    He was the chief promoter and organizer of the Metropolitan Street Railroad Company, and defined its line in the charter so as to avoid having a street-railroad in front of his home, which he afterwards built at great expense, believing that the line of that company, as well as that of the Atlanta Street Railroad Company, was permanently established.    The defendants, in addition to running a line in front of his residence, intend to tear up the tracks on Woodward avenue, on Pulliam street, and on Clarke street from Pulliam to Washington street, or to change existing schedules, to the inconvenience of people residing in that locality; and they have no right to do this.    There is no charter power to change the established routes on these streets; the route of the Metropolitan Street Railroad Company was fixed by its charter, and the powers of the Atlanta Street Railroad Company as to route were exhausted, so far as these streets were concerned, when its line was built; and any company which succeeds by purchase or incorporation to the franchises or road of another company

is bound to carry out all obligations of the former company as to schedule, line or route.    Under the constitution no charter authorizing a company to buy the railroad of another company and change its route can be granted.    There is no necessity for the running of the proposed line in order to give transportation facilities to people residing in that locality, those now existing being sufficient.    The charter of the Atlanta Consolidated Street Railroad Company is void, because there was no law authorizing the grant of such a charter; and its invalidity was recognized in the enactment of "An act to ratify and confirm the incorporation of street and suburban railroad companies under the general law for the incorporation of railroads," etc., which act was approved August 31, 1891.    This act also is void, being repugnant to the provision of the constitution which prohibits the enactment of retroactive laws. The charter is void for the further reason that it is in conflict with the provision of the constitution that the General Assembly shall not authorize the construction of any street passenger railway within the limits of a city without the consent of the corporate authorities (Civil Code, § 5732), for it does not appear from the application for the charter that the city consented to it; and no subsequent consent could render the charter valid.    The charter is void also because it grants power to convey freight as well as passengers.    The charter of the Atlanta Railway and Power Company is void, because of failure to comply with the requirement of the constitution just mentioned, and because no valid charter could be granted without defining the streets intended to be occupied (Acts 1894, p. 69, § 1); which was not done.    The Metropolitan Street Railroad Company's line was established as a competing line to that of the Atlanta Street Railroad Company, and in uniting these lines it is sought to defeat competition and create a monopoly.    This was the purpose of Hurt and his associates and their successors in obtaining control of these lines; and they are now attempting to create a monopoly of all the street-car lines in the City of Atlanta. The ordinance relied on as authority for the connecting of these lines is void, because it seeks to authorize different companies to connect their lines and thereby create a monopoly.    It is void also in attempting to grant an exemption from the operation of a general ordinance, in defiance of the principle of the constitution which requires that all laws shall be uniform in their operation.    The At-

lanta Railway and Power Company has usurped franchises granted to the Metropolitan Street Railroad Company. It was beyond the power of the court to pass an order for the sale of the franchises, without provision having been made therefor in the charter. Such franchises could be obtained only by complying with the law laid down in the Civil Code, § 2167, par. 11, 12, and § 2168. The plaintiff was not a party to the proceedings connected with the sale. He has never, since the purchase in 1890 of the share of stock now held by him, attended a meeting of the Metropolitan Street Railroad Company, nor been notified of any of its meetings, and has never consented to the amendment of its charter; and he has always opposed the construction of a street-car line in front of his residence.

A joint demurrer and a joint answer were filed in behalf of the Atlanta Railway and Power Company and the Atlanta Street Railroad Company. The answer states that the Atlanta Railway and Power Company has acquired the rights and properties of the other defendants, and is the only defendant interested in the suit. It is admitted that the franchise of the Metropolitan Street Railroad Company to be a corporation still exists, but it is contended that the sale by the receiver conveyed its property and the other franchises. The allegations of the plaintiff as to damage are denied; also the allegations as to a purpose to violate the laws relating to monopoly. It is contended that the construction of the street railway would not be an additional servitude entitling owners of abutting property to complain of damage; that the matters complained of could not be inquired into by the court at the instance of the plaintiff, but could be inquired into only at the suit of the State; that the plaintiff is not entitled in this proceeding to attack collaterally the decree under which the receiver's sale was made; and that he is barred by laches from maintaining the suit.

*Julius L. Brown* and *Albert H. Cox*, for plaintiff.
*King & Anderson* and *Payne & Tye*, for defendant.

COBB, J. 1. Corporations, using that term to designate organizations merely claiming or alleged to be corporations as well as those which are in all respects legally constituted, have been divided into three classes, corporations de jure, corporations de facto, and corporations by estoppel. Corporations de jure have been de-

fined to be those whose legal right to exist can not be questioned even by the State itself. The expression " de facto corporations" is generally used to denote associations exercising corporate powers under color of a more or less legal organization. One who has contracted with a corporation as such is estopped to deny its existence as a corporation at the date of the contract, in any suit arising thereunder, and such a corporation has been, it seems to us with great propriety, designated a corporation by estoppel. See Notes of John Lewis, Esq., to Vanneman *v.* Young, 3 Am. R. & Cor. Cas. 662 (52 N. J. L. 403), and authorities there cited. Where there can not be a corporation de jure there can not be one de facto. In order to constitute a corporation de facto, it is necessary that there should be either a charter or a law under which such a corporation could exist with the powers it assumes to exercise, and a colorable compliance with the requirements of the charter or the law and a user of the rights claimed under the same. See *Georgia Southern & Florida R. Co.* v. *Trust Co.*, 94 *Ga.* 306, 316, and cases cited. Whether or not the rule, that there must be a charter or a law authorizing the creation of a corporation and a colorable compliance with the terms of such charter or law, applies to corporations by estoppel, is a question upon which there is some conflict of authority. The better doctrine seems to be that estoppel prevails notwithstanding the law under which the corporation claims to exist may be unconstitutional or otherwise invalid. See the notes to Vanneman *v.* Young, supra, and cases therein cited; *G. S. & F. R. Co.* v. *Trust Co.*, 94 *Ga.* 315, and cases cited.

The power to create corporations resides in the State. If there is nothing in the constitution limiting or restricting the authority of the lawmaking body in this respect, this power is to be exercised by it. When this power is possessed by the State legislature, the question whether a given company of individuals has a legal corporate existence is to be determined by ascertaining whether the legislature has given its consent to the existence of such a corporation, either by the passage of a general law providing the manner in which corporations of that character may be formed, or by a special charter, if the legislature has authority to create corporations in this manner, and by ascertaining further whether there has been a compliance with the terms of the charter, whether the same be granted by special enactment or under the provisions of a general

law.  If the corporation hàs a charter issued to it in the manner prescribed by law, and has in its organization complied fully with every requirement of the charter, then, even as against the State, the corporation has a right to exist, and is technically a de jure corporation.  In order, therefore, to constitute a de jure corporation, when the power to create corporations is vested in the legislature, it is necessary that the legislature should consent to the existence of the corporation in the manner and form in which it is asserting its right to exercise corporate functions.  If the lawmaking body gives its consent that a company of individuals may exercise corporate power in a given way, the right of such company of individuals to exercise such authority can not be attacked collaterally by any one against whom the corporation may be proceeding within the limits of its organic powers, and not even the State itself will be permitted to question the right of the corporation to exist and exercise the powers which the legislature has consented it should exercise, so long as the corporation is not guilty of any act which would be a sufficient reason for the State to institute a proceeding to forfeit the charter of the corporation.  If a corporation has been formed, and is exercising corporate authority under color of a charter irregularly granted, or under a law authorizing the grant of corporate powers to such a corporation, it is well settled that defects in the organization of such a corporation can be cured by an act of the legislature which either expressly or impliedly declares that such corporation has a right to exist without regard to such defects.    1 Thomp. Cor. § 512; 1 Mor. Cor. § 20; Taylor, Priv. Cor. § 157; Central Co. v. Alabama Co., 70 Ala. 120, s. c. 9 Am. Cor. Cas. 8. This has been held to be true even in cases where the lawmaking power of the State was prohibited by the constitution from creating the corporation in the first instance.    See Central Co. v. Alabama Co., supra.

If the lawmaking power of the State can, by giving its consent to a company of individuals to exercise corporate functions, confer upon such a company corporate authority which it would not have in the absence of legislative consent, on account of the failure to comply with the requirements which the law imposed upon persons desiring to form corporations, we can see no good reason why a company of individuals assuming to be a corporation under an erroneous impression as to their right to exercise corporate powers

might not become a corporation de jure by subsequent legislative consent.    A company of individuals who assume to act as a corporation when they have not complied with the law providing for the organization of such a corporation are as guilty of a usurpation as would be a company of individuals who assume to act as a corporation without any authority of law whatever.    As against the State, neither company has become a corporation, nor can become one without the consent of the State; and if one can become so with such consent, it would seem to follow that the legislature has authority to declare that the other might also.    In the absence of constitutional limitations, the lawmaking body of the State has authority to declare upon what terms individuals may exercise corporate powers, and also that an existing company of individuals shall be thereafter a corporation; and if such company of individuals proceed under the authority thus granted, they will be, even as against the State itself, a legally organized corporation.    The important thing to be ascertained is whether the State through its constituted authorities has given its consent that the company of individuals shall be a corporation and exercise corporate powers. The manner in which the lawmaking power gives its consent is, in the absence of constitutional restrictions, entirely immaterial.    Any act of the legislature from which its consent can be inferred that a certain body of individuals shall be a corporation and exercise corporate powers of a certain character is all that is necessary to confer upon such individuals these powers.    The legislature can give its consent that those who have usurped corporate power in the past may lawfully exercise such power in the future; and this is true whether such usurpation has been done under color of a charter issued pursuant to a law, or under color of a charter issued by an officer in violation of law.    Even if the General Assembly, as was contended in the argument, had no authority, at the time that the general railroad act of 1881 was passed, to declare that charters to railroads could be issued by the secretary of State, and such act was violative of that provision of the constitution which prohibits the General Assembly from devolving upon officers of the executive department either legislative or judicial duties, this would not prevent the General Assembly from afterwards expressly recognizing and giving its consent to the existence of corporations formed under this alleged invalid law.

By an application of the principles above announced it is to be determined whether the Atlanta Railway and Power Company is a corporation of this State, authorized to exercise the corporate powers claimed by it as a street-railway company.　On the 16th day of May, 1891, what purported to be a charter under the general railroad law of 1881 (Code of 1882, § 1689(a) et seq.) was granted to the Atlanta Consolidated Street Railroad Company.　The name of this company was afterwards changed to the Atlanta Railway and Power Company.　On August 31, 1891, an act was approved declaring that all general laws of this State for the incorporation of railroads were applicable to all street and suburban railroad companies to be thereafter incorporated.　Acts 1890-91, vol. 1, p. 168. On the same day an act was approved which declared that "all charters heretofore granted by the secretary of State to street and suburban railroad companies are hereby confirmed and declared to have had full effect from their dates."　Acts 1890-91, vol. 1, p. 169. In *Dieter* v. *Estill*, 95 *Ga.* 370, it was held that in 1889 the General Assembly could constitutionally grant a special charter to a street-railroad company, even if the act of 1881, providing for the incorporation of railroad companies, was a general law within the meaning of that provision of the constitution which declares that no special law shall be passed in any case for which provision has been made by an existing general law, for the reason that the act of 1881 did not apply to street-railroad companies.　There was, on May 16th, 1891, no law of this State authorizing the secretary of State to grant a charter to a street-railroad company.　It is unnecessary to determine what was the legal status of the Atlanta Consolidated Street Railroad Company between the date of the alleged charter issued to it by the secretary of State and the date of the act of the General Assembly purporting to confirm such charter. The question to be determined is, what was the legal status of this alleged corporation after the passage of the confirmatory act of 1891.　It is not claimed that it is a corporation by estoppel as against the plaintiff in error ; for he has had no dealing with the persons composing this alleged corporation which would estop him from bringing in question their right to exercise corporate powers. If they are exercising such powers under color of the confirmatory act of 1891, their company would, under the principles above referred to, clearly be a de facto corporation from the date of the

passage of that act, and as such entitled to exercise the powers sought to be exercised by it, as against any one except the State. But does not the confirmatory act of 1891 do more than merely furnish color of authority to this company? When the General Assembly convened in 1891, the condition of affairs in reference to street-railroad companies in this State was this: There were street-railroad companies claiming to be corporations under authority of charters issued to them by the secretary of State, which conferred upon them such of the powers embraced in the general railroad law of 1881 as were applicable to companies of that character. There must have been doubt in the mind of the General Assembly at that time as to whether the general railroad law of 1881 was applicable to street-railroad companies. The above-mentioned legislation during that session on the subject of street-railroads is all that is necessary to show the existence of this doubt. Street-railroad companies were in existence, assuming to exercise the corporate powers mentioned in the general law of 1881 under charters granted by the secretary of State; and it could be easily foreseen that other street-railroad companies were to be organized in the future. It was incumbent, therefore, upon the General Assembly, in order to relieve doubt and avoid confusion in reference to the matter, to pass legislation which would fix the legal status of the existing street-railroad companies and also provide for the incorporation of such companies in the future.

It is to be kept in mind that, at the time this session of the General Assembly convened, there was nothing in the constitution of the State which at all restricted the power of the General Assembly as to the manner in which charters to street-railroad companies should be granted, and there was in existence no general law on the subject which could, in any view, have the effect of prohibiting the passage of even special charters, if the General Assembly saw proper to do so. This being true, the General Assembly was in complete control of this matter. In the exercise of the power it thus had, it passed, as above appears, two acts, each approved by the Governor on the same day, one providing that in the future all street and suburban railroad companies might be incorporated under the provisions of the general railroad law of 1881, and the other that the charters theretofore issued by the secretary of State under that law should be confirmed and made valid. Each of these

acts is a general law; one applies to all street-railroad companies thereafter organized; the other to all street-railroad companies theretofore organized under charters granted by the secretary of State. See *Union Savings Bank* v. *Dottenheim,* 107 *Ga.* 606. The power of the General Assembly to pass these two general laws at that time can not be at all questioned. The street-railroad companies organized prior to the confirmatory act of 1891 were not organized under any charter which could be lawfully issued to them, nor was there any law for the incorporation of such companies, and it may be that they were not even corporations de facto. But be this as it may, they were in existence, they were assuming to exercise corporate functions which could only be granted by the State, and even treating them as bald usurpers of every power they attempted to exercise, the General Assembly — the body vested with authority to create corporations — had ample power at that time to forgive the usurpation and say to them, "For the future you may legally exercise corporate powers of that character which you have in the past merely usurped." Is not the true construction of the confirmatory act of 1891 one which would make the General Assembly simply say to these usurping corporations, "Henceforth you have the consent of the State to exercise powers which heretofore you have never had"? Whether the General Assembly could at that time confirm and render valid acts of these corporations performed prior to the passage of the confirmatory act it is not necessary in the present case to decide; but that the General Assembly had authority to say to them that they might in the future exercise the corporate powers attempted to be conferred in the invalid charters which they obtained is beyond all question. If this is true, every street-railroad company organized under a charter granted by the secretary of State prior to the passage of the confirmatory act of 1891 would, upon the acceptance of the provisions of that act, become not only as to every person who dealt with it, and every person against whom it proceeded under the authority of the general railroad law of 1881, but also as against the State itself, a de jure corporation. The acceptance by the corporation of the provisions of the confirmatory act may be express, by resolution upon its minutes, or implied from the fact that after that date it sought to exercise powers which could be lawfully exercised only under the provisions of the act. A street-railroad company after the date

of this act found attempting to exercise corporate powers would be presumed to be doing so legally; the presumption being that it was acting under the confirmatory act of 1891 rather than under the prior invalid charter without regard to the confirmatory act. And this presumption would prevail until it was shown that it had expressly repudiated any right conferred upon it by the confirmatory act of 1891.

2. The constitution declares that "The General Assembly shall not authorize the construction of any street passenger-railway within the limits of any incorporated town or city, without the consent of the corporate authorities." Civil Code, § 5782. It is contended that one effect of this provision of the constitution is to prohibit the General Assembly from delegating to any public officer the authority to grant a charter to a street-railway company, but that this authority must be exercised directly by the General Assembly. If it is meant by this contention that the General Assembly can not constitutionally vest in any public officer a discretion with reference to what corporate powers shall be given to street-railway companies, the contention is probably well founded. But if it goes to the extent of asserting that it is beyond the constitutional power of the General Assembly, after providing what powers shall be granted to street-railway companies and what shall be done by them in order to acquire such powers, to vest in some public officer of the State simply the duty of granting a charter authorizing corporations to exercise the powers set forth in the legislative act upon conforming to certain regulations, then the contention would not be well founded; and there seems to be no good reason why an act providing for the incorporation of street-railway companies and authorizing the secretary of State to grant them a charter could not have been constitutionally passed in 1891, though it was within the power of the General Assembly at that time, certainly prior to the passage of the act of August 31 of that year, providing a general law for the incorporation of street-railway companies, to grant by legislative enactment a special charter to a street-railway company. It is further contended that the provision of the constitution above quoted prohibits the General Assembly from granting, either by a special law or under the operation of a general law, a charter to a street-railway company which was to operate within the limits of an incorporated town or city, until

the consent of the town or city was obtained to the incorporation of the company. The provision of the constitution does not so declare. The consent of the authorities of a city is not a condition precedent to the granting of a charter to a street-railway company. The consent of such authorities is, under the constitution, simply a condition precedent to the exercise by the company of the charter power to construct a railway upon the streets of the city. The General Assembly could in 1891 incorporate, either by a special or a general law, a street-railway company, and no matter how broad the act of incorporation was with reference to the power of the company to construct a street-railroad, it would give the company no authority to construct the road upon the streets of an incorporated town or city until permission had been obtained for that purpose from the corporate authorities. The corporation might be organized and might be in full legal existence and able to exercise all the corporate powers granted; but, under the constitution, before it could exercise any power with reference to using the streets of any town or city, it was required to obtain permission from the municipal authorities. But the permission of these authorities is not, under the constitution, a condition precedent to the obtaining of the charter, but is only a condition precedent to the use of the streets.

3. It is contended that even if the effect of the confirmatory act of 1891 would in any case make a street-railroad company theretofore existing a legal corporation, it will not in the case of the Atlanta Railway and Power Company, for the reason that the charter granted to it by the secretary of State, and claimed to have been afterwards confirmed by the act above mentioned, contained provisions, in reference to the purchase of lines of railway, which were in contravention of that provision of the constitution declaring that the General Assembly should not have any power to authorize any corporation to buy shares in any other corporation or to make any contract or agreement whatever which might have the effect or was intended to have the effect of defeating or lessening competition or encouraging monopoly. There are no provisions in the charter of the Atlanta Railway and Power Company in violation of that provision of the constitution referred to; and even if it could be shown that the company had entered into contracts or agreements which would be held in violation of the constitution, this would not in-

terfere with its right to exist as a corporation or to exercise all the legitimate powers which had been conferred upon it, or to hold and enjoy property to which it had acquired title, so long as the State itself did not see proper to proceed against it upon the ground that it had acquired its property or some part thereof in a manner which was opposed to the policy of the law as it is set forth in the constitution of the State. The State alone can·raise questions of this character. They can not be. raised in a controversy between the ʻcorporation and a private citizen. See *American Mortg. Co.* v. *Tennille,* 87 *Ga.* 30.

4. It is further contended that, as the constitution declares that private property shall not be taken or damaged for public purposes without just and adequate compensation being first paid (Civil Code, § 5729), the court erred in refusing to grant the injunction in this case, the plaintiff making a prima facie case and showing that his property would be damaged by the operation of the street-railway in the street adjacent to his residence. In reference to this contention, it is to be said that the evidence before the judge was conflicting on the question as to whether the building and operation of the street-railroad would damage the plaintiff's property; and the refusal to grant the injunction being in effect a finding that it would not be damaged, this court will not interfere with the discretion of the judge in refusing to grant the injunction. In addition to this, it is to be said that since the decision of this court in *Moore* v. *Atlanta,* 70 *Ga.* 611, it has been the settled law of this State that the court would not by an interlocutory injunction interfere with a public improvement in which no part of the property of the citizen was actually taken; and attention was called, in the opinion in that case, to the fact that the Supreme Court of Illinois had rendered a decision to the same effect, when dealing with a constitutional provision similar to ours and from which ours was taken. See also, in this connection, *Hurt* v. *Atlanta,* 100 *Ga.* 280.

5. It is further contended that the charter of the Atlanta Railway and Power Company is invalid, because it attempts to confer upon it the right to carry freight, for the reason that there is no law authorizing the granting of a charter to a street-railroad company to become a common carrier of freight. Even if there is contained in the charter of this company the power to become a common carrier of freight, so far as the present record is concerned it does not

appear that the company is attempting to exercise this power, and there is nothing to which our attention has been called in the present record to indicate that it is the intention of the railway company to use for this purpose the line of railway being constructed adjacent to the plaintiff's property. If the power to authorize such a company to carry freight does not exist in the General Assembly, so much of the charter as refers to this power would be simply inoperative, and certainly would not affect its right to exercise the powers lawfully conferred, at least so long as it does not attempt to exercise the power to carry freight.

6. By reference to the statement of facts which precedes this opinion it will be seen that there were two lines of railway from the center of the City of Atlanta going out in the direction in which the plaintiff's property is located; one formerly owned by the Atlanta Street Railroad Company, which, after going a short distance on Washington street, left that street at Woodward avenue, and the other formerly owned by the Metropolitan Street Railroad Company, which entered Washington street at Clarke street, and then proceeded along Washington to the city limits; the plaintiff's residence being located on Washington street between Clarke street and Woodward avenue. The property of both of the companies above named having been acquired by the Atlanta Railway and Power Company, it is its purpose to build its railway along Washington street from Woodward avenue to Clarke street, so as to have a continuous line along Washington street from the point where the Atlanta Street Railroad Company entered that street. As the Atlanta Railway and Power Company has authority to construct a street-railroad along the streets of the City of Atlanta, if it has the permission of the city authorities, the fact that the construction of the line on Washington street from Woodward avenue to Clarke street would have the effect of uniting lines formerly belonging to two separate and distinct companies would furnish no sufficient reason for enjoining the construction of this line at the instance of an owner of property situated between Woodward avenue and Clarke street, even though such property-owner might be the holder of a share of stock in one of the companies whose property had been acquired by the Atlanta Railway and Power Company. There was evidence before the judge showing that this company had acquired the property of the other two companies, and having acquired this property,

there necessarily went with it the right to use it for any purpose and in any way in which the purchaser saw proper, not prohibited by law or by its charter; and the fact that these two lines of railway had been formerly owned by two separate and distinct companies would constitute no reason for preventing a third company, which had become the owner of the property of both, from laying an additional line of track and connecting the two tracks of the other companies and using the tracks so connected in such a way as was for the interest of the company, provided no obligation imposed upon the company by their charter, or by the terms of the purchase, or by the law of the State was violated.

7. In the confirmatory act of 1891 it was provided that, "When any street-railroad company, by incorporation or otherwise under general law, as aforesaid, has succeeded by purchase, or by such incorporation under general law, to the franchise or road of any other or former company or road, such successor company shall be liable for and shall carry out and discharge any and all obligations of such former company or road, as to schedule, line, or route, as such former company was liable for or subject to." It is contended by the plaintiff that if the Atlanta Railway and Power Company should build the line from Woodward avenue to Clarke street, and thus connect the lines formerly owned by the two companies whose property it acquired, there would be a change in the line or route of these old companies, which would necessarily bring about a change in the schedule, and that this would certainly be the case if the company abandoned the line on Woodward avenue and the line on Clarke street as well as the line on Pulliam street connecting therewith. The record does not disclose any effort or intention on the part of the Atlanta Railway and Power Company to abandon the lines above referred to. This is probably why the judge refused to grant an injunction to restrain them from abandoning these lines, being of the opinion that there was not a sufficient showing before him that such abandonment was so probable that an injunction should issue to prevent it, even if the plaintiff would be entitled to an injunction if such abandonment was attempted. It is, therefore, not necessary to determine in this case whether, if the Atlanta Railway and Power Company were to attempt to abandon the lines on Woodward avenue and Clarke and Pulliam streets, the plaintiff would have a right to complain, either

as owner of property adjacent to one of these lines, or as the holder of stock in the company which was the former owner of one of the lines. But certainly an actual abandonment by the railway company of the Woodward avenue line and the Clarke and Pulliam street lines would not be a sufficient reason for enjoining the company from building a line from Woodward avenue to Clarke street, if the building of such line was authorized by the charter of the railway company as well as by the city authorities of Atlanta. The building of this line and the operation of cars thereon would not in any way affect the rights of the plaintiff as the owner of property on Pulliam street or as a stockholder in the company formerly owning the line of road on Pulliam street, or any right, if there is any, in the Woodward avenue line. If he has any rights as property-owner or otherwise in the other lines, such rights are not to be protected by preventing the construction of the additional line, but may be asserted whenever there appears to be a present purpose on the part of the railway company to abandon the lines in the continuance of which he may have a legal interest. What will, therefore, be determined in the present case is whether the Atlanta Railway and Power Company has authority to build its line along Washington street from Woodward avenue to Clarke street; and what will be the rights of the plaintiff, if he has any, under the confirmatory act of 1891, in reference to the lines, routes, and schedules of the Woodward avenue line and the lines of which the Pulliam and Clarke street lines formed a part, will not now be determined. It is entirely possible for the Atlanta Railway and Power Company to build a line from Woodward avenue to Clarke street and operate its cars upon that as a part of its Washington street line, and at the same time operate cars upon the route of which the Woodward avenue line formed a part, as well as upon the route of which the line along Pulliam and Clarke streets formed a part, in exact compliance with the obligations which rested upon the companies which were the former owners of these lines, as to schedule, lines, and routes.

8. Another reason urged why the court erred in not granting an injunction is that the ordinance of the City of Atlanta under which the Atlanta Railway and Power Company claims the right to construct its line between Woodward avenue and Clarke street is void, for the reason that it is in conflict with a prior ordinance of the

city, declaring upon what terms the right to use the streets by street-railway companies shall be granted. If there is anything in the charter of the City of Atlanta which prohibits the mayor and general council from passing a special ordinance in conflict with a prior general ordinance, our attention has not been called to it; and unless there is a provision in the charter to that effect, the municipal legislature would have a right to pass an ordinance granting to a street-railroad company the right to use the streets upon certain conditions, or without conditions, notwithstanding the fact that there was in existence at the time of such grant an ordinance providing generally that street-railroad companies should be required to conform to certain named conditions. Especially would this be true in the present case, where the conditions from which the Atlanta Railway and Power Company was relieved, which relief is the subject-matter of the plaintiff's complaint, were matters in which the city authorities representing the entire people of the city alone were interested, and which did not concern any individual citizen.

9. When a street-railway company is authorized to construct a line of railway in the streets of a town or city, after permission of the municipal authorities has been obtained for that purpose, and there is nothing in the charter of the company which expressly restricts it to building a single track along a street, such charter would authorize the building of a double track, provided the consent of the city authorities was obtained to the construction of the double track along its streets. There is no merit in the contention that a double-track railroad is two railroads, and that a single track is one railroad. The Atlanta Railway and Power Company may, under its charter, build as many double tracks along the streets of the City of Atlanta as it may lawfully obtain the consent of the city authorities to construct.

10. The evidence which was rejected by the judge does not seem to have been either material or relevant. After a careful consideration of the case as a whole, the conclusion is reached that the judge did not err upon any matter of law which was passed on by him, and did not abuse the discretion vested in him as to any matter of fact where the evidence was conflicting.

*Judgment affirmed. All the Justices concurring.*